# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| BRIAN FREDERICK LUCAS, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) Case No.: 5:18-cv-01204-LSC-JEO |
| | ) |
| DEWAYNE ESTES and the ATTORNEY | ) |
| GENERAL OF THE STATE OF | ) |
| ALABAMA, | ) |
| | ) |
| Respondents. | ) |

## <u>MEMORANDUM OPINION</u>

This is an action on a petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 by Brian Frederick Lucas, an Alabama state prisoner acting *pro se*. (Docs.[1] 1, 1-1, 1-2). Lucas challenges his convictions in the Circuit Court of Madison County, Alabama, for sexual abuse in the first degree and attempted sexual misconduct. The State has filed an answer in opposition to the petition (Doc. 8), and Lucas has filed a reply thereto. (Doc. 10). Upon consideration, the court find that the petition is due to be denied.

---

[1] References to "Doc. __" are to the document number of the pleadings, motions, and other materials in the court file, as compiled and designated on the docket sheet by the Clerk of the Court. Unless otherwise noted, pinpoint citations are to the page of the electronically-filed document in the court's CM/ECF system, which may not correspond to pagination on the original "hard copy" of the document presented for filing.

# I.    BACKGROUND

## A.    Trial Court Proceedings

On September 26, 2014, a Madison County grand jury indicted Lucas for four sex offenses. (Doc. 8-1 at 82-85). Count 1 charged attempted sodomy in the first degree, alleging that Lucas attempted to engage in deviate sexual intercourse by forcible compulsion, *see* Ala. Code §§ 13A-6-63(a)(1) and 13A-4-2. (*Id*. at 83). Count 2 charged sexual abuse in the first degree, alleging that Lucas had subjected the victim to sexual contact while physically helpless or mentally incapacitated, in violation of Ala. Code § 13A-6-66(a)(2). (*Id*.) Both of those counts identified the victim as H.B.[2] (*id*.), whose older sister was formerly married to Lucas. When the incident underlying the charges occurred on the morning of December 31, 2013, H.B. was 15 years old. *See Lucas v. State*, 204 So. 3d 929, 932, 937 (Ala. Crim. App. 2106). Counts 3 and 4 of the indictment both also charged Lucas with sexual abuse in the first degree in violation of § 13A-6-66(a)(2), but against a different victim, M.C., also a minor female. (*Id*.)

Lucas moved for separate trials, arguing that consolidating the offenses against both victims would result in the jury hearing evidence of collateral bad acts

---

[2] Lucas was originally indicted on August 1, 2014. (Doc. 8-1 at 17-18). However, after Lucas's counsel moved to dismiss Count 1 of that indictment because it failed to identify a victim (*id*. at 55), he was re-indicted on September 26, 2014, which cured the defect. That mooted the motion to dismiss. (*See* Doc. 8-3 at 51-52).

that Lucas posited would be inadmissible under Rule 404(b), Ala. R. Evid. (Doc.

8-1 at 52-54). The trial court granted the motion (*id*. at 72-73), and on February 9,

2015, Lucas, represented by retained counsel Richard D. Jensen, went to trial on

just the first two counts of the indictment, involving his alleged offenses against

H.B. The Alabama Court of Criminal Appeals ("ACCA") summarized the State's

evidence at trial as showing the following facts related to Lucas and H.B., as

follows:

> S.B. has three daughters—A.B., K.B., and H.B. A.B., S.B.'s oldest
> daughter, married Lucas in 2007; they had one child, L.L., and later
> divorced. Lucas subsequently married a woman named Autumn.
> A.B. maintained primary physical custody of L.L. following her
> divorce from Lucas. L.L. stayed with S.B. several nights a week
> when A.B. worked third shift as a nurse at a Huntsville hospital.
> Lucas would sometimes visit L.L. while L.L. was spending the night
> at S.B.'s house.
>
> On December 31, 2013, at approximately 3:30 a.m. S.B.
> received a telephone call from Lucas, who asked if he could come to
> S.B.'s house "to talk." S.B. testified that she believed Lucas was
> intoxicated when he telephoned her. S.B. told Lucas he could come to
> the house; Lucas arrived less than 10 minutes later. S.B. listened to
> Lucas talk about problems he was having with his second wife at the
> time. S.B. believed it was in Lucas's best interests not to drive home
> because he had been drinking, so she told Lucas that he could spend
> the night. Lucas got into bed, fully clothed, with his son, L.L., who
> was sleeping in S.B.'s bed. S.B. went to sleep in a guest bedroom.
>
> H.B., who was 18 years old at the time of trial, testified that on
> the evening of December 30, 2013, she went to sleep in her bedroom
> around 10:30 p.m. H.B. testified that at approximately 6:00 a.m. on
> December 31, 2013, she "felt something agitating [her] face, rubbing

it." (R. 173.)[3] H.B. testified that she "could feel it the whole time" and that she felt it "around the base of [her] nose and [her] upper lip." (R. 173.) H.B. testified that she slowly started to wake up and saw an erect penis in her face and the silhouette of a man holding it. H.B. immediately pulled back and covered her mouth with her hands. H.B. testified that it was dark in the room and that she could not see the man's face but could see that he was bald and that he was wearing pants that had been pulled down to the top of his thighs and a belt that had been undone. After staring at each other for a few moments in silence, H.B. saw the man pull up his pants, walk out of her room, and then heard him walk into S.B.'s bedroom. H.B. followed the man into S.B.'s bedroom, turned on the bedroom light, and saw that it was Lucas. H.B. then returned to her bedroom and locked the bedroom door.

Shortly thereafter, H.B. told S.B. what had happened and then both H.B. and S.B. told A.B. about the incident after A.B. arrived home from work. S.B. telephoned the Huntsville Police Department, who then took a statement from H.B. and transported H.B. to Crisis Services of North Alabama for an interview. H.B. then went to the Madison County Children's Advocacy Center for another interview. Lucas was subsequently arrested.

H.B. testified regarding two incidents that occurred with Lucas before December 2013. H.B. testified that when she was 13 or 14 years old, Lucas telephoned her at 2:00 a.m. when he was drunk and asked if he could come over. H.B. agreed and left the door unlocked for Lucas before returning to her bed. H.B. testified that when Lucas arrived he got in bed with her, put his arm around her and said "'baby, you're so hot' about three times." (R. 184.) H.B. pushed Lucas's arm off of her and went to S.B.'s room to sleep. The second incident occurred when H.B. was 15 years old. H.B. testified that she went over to Lucas's parents' house to swim. After they swam for a couple of hours, Lucas and H.B. went inside and sat down in the living room, where Lucas searched for a pornography Web site on his computer. H.B. testified that Lucas "clicked on a video of a girl and guy having

---

[3] References herein to "R. __" are to the trial transcript found at documents 8-3 through 8-7. Page references are to the transcript page numbers located in the upper right-hand corner.

4

anal sex and he said, wow, she's taking it like a champ. Most girls are like, oh, it hurts too bad. And then he closed it." (R. 186.)

Chad Smith, an investigator with the Huntsville Police Department, interviewed Lucas on January 27, 2014. An audio recording of the interview was played for the jury at trial. In his statement to police, Lucas told Smith that in the early morning hours of December 31, 2013, he woke up to find water spilled on him in the bed he was sharing with L.L. Lucas went into H.B.'s bedroom and tried to wake her up to help him clean up the water. Lucas told Smith that he shook H.B. and pinched her nose but H.B. would not wake up. Lucas then returned to S.B.'s room where he had been sleeping with L.L. According to Lucas, shortly thereafter H.B. came into the room for a moment before leaving to return to her own bedroom.

*Lucas*, 204 So. 3d at 932-33.

While Lucas was tried only on the two counts naming H.B. as the victim, the

trial court ultimately decided to allow the State also to elicit testimony from the

other victim named in the indictments, M.C., about sex-related incidents with

Lucas. The ACCA summarized M.C.'s testimony as follows:

M.C., who was 19 years old at the time of trial, testified that when she was 17 and 18 years old she babysat for Lucas's ex-wife Autumn's child. On February 2, 2014, M.C. turned 18 years old. M.C., who was with her boyfriend, telephoned Lucas on her birthday and asked Lucas to obtain "some alcohol" for them. M.C. and her boyfriend drove to Lucas's house to "hang out" and drink. (R. 306.) After drinking for a couple of hours, M.C. and her boyfriend fell asleep on Lucas's couch. M.C., who was lying on the outside of the couch next to her boyfriend, was awakened when she felt fingers down the back of her pants and in her rectum. M.C. testified that her pants were pulled down. M.C. testified that she did not know whose fingers they were at the time but at first thought that her boyfriend was touching her. M.C. testified that she got up off the couch and

went to the bathroom.  When she got up, M.C. saw Lucas kneeling beside the couch with his head on an ottoman that was pushed up against the couch.  M.C. stated that her boyfriend was "knocked out" during this time.  (R. 310.)

After she returned from the bathroom, M.C. lay back down on the couch and went back to sleep.  M.C. testified that shortly thereafter she woke up again when she felt fingers inside her vagina.  M.C.'s pants were pulled down below her knees. M.C. testified that she then realized that it was not her boyfriend touching her because his arm was underneath her.  M.C. testified that she opened her eyes and saw Lucas kneeling over her.  M.C. tried to pull away but Lucas would not stop touching her.  M.C. testified that she pretended like she had to go to the bathroom again and Lucas stopped touching her.  M.C. then woke her boyfriend up and they left Lucas's house.

*Lucas*, 204 So. 3d at 33.

The jury found Lucas guilty of both attempted forcible, first-degree sodomy and sexual abuse in the first degree, for subjecting H.B. to sexual contact while physically helpless.  (Doc. 8-2 at 76, 78, 79-80).  The jury was also instructed upon attempted sexual misconduct under Ala. Code § 13A-6-65(a)(3) as a lesser-included offense of the attempted first-degree sodomy charge.  But having found Lucas guilty of the greater offense, the jury did not return a verdict on the lesser.  (*Id.* at 77).  The day after the court indicated that it would enter a judgment on the jury's verdict, the trial court granted a motion by the State to *nolle prosse* the remaining two charges of the indictment, Counts 3 and 4, relating to Lucas's alleged offenses against M.C.  (*Id.* at 74, 89).

On March 13, 2015, the trial court sentenced Lucas to a fifteen-year term of imprisonment on the attempted first-degree sodomy conviction, split to serve three years, the balance suspended, followed by three years of probation. (Doc. 8-2 at 109-110). In the same judgment, Lucas received a seven-year year sentence on the first-degree sexual abuse conviction, again split to serve three years, the balance suspended, followed by three years of probation. (*Id.*) The court ordered the sentences to run concurrently. (*Id.*)

## B. Direct Appeal

Lucas appealed to the ACCA. Still represented by Jensen, with another attorney, William L. Pfiefer, Jr., acting as appellate co-counsel (Doc. 8-3 at 9), Lucas raised five claims:

1. The trial court erred in defining the mouth and nose as intimate parts as a matter of law under Ala. Code § 13-6-60(3) (1975), resulting in an erroneous denial of the motion for judgment of acquittal and erroneous jury instructions on the charge of sexual abuse in the first degree.

2. The trial court erred in denying the motion for judgment of acquittal on the charge of attempted sodomy in the first degree where there was no evidence presented of forcible compulsion and no evidence presented that Mr. Lucas attempted to engage in deviate sexual intercourse.

3. The jury returned mutually exclusive verdicts of guilt.

4. The State failed to lay a proper predicate for the admissibility of Mr. Lucas's statement to law enforcement because they did not establish that it was knowing or voluntary and did not provide any evidence of what specific *Miranda* warnings were given to Mr. Lucas.

> 5. The trial court erred in admitting collateral-act evidence when it was not admissible under any of the permissible purposes under Rule 404(b) of the Alabama Rules of Evidence.

(Doc. 8-8 at 4).

On April 29, 2016, the ACCA issued a published opinion that affirmed the judgment below in part, reversed it in part, and remanded the action to the trial court for further proceedings. *Lucas*, 204 So. 3d at 943; (*see also* Doc. 8-13 at 10-42). Specifically, the court of appeals affirmed Lucas's conviction for sexual abuse in the first degree, holding that the evidence supporting Lucas had rubbed his penis on H.B.'s upper lip area allowed the jury to find that he had subjected H.B. to "sexual contact" within the meaning of § 13A-6-66(a)(2). *Id.* at 936. The appellate court also declined to address, as not properly raised below, Lucas's claim that he was entitled to a new trial on the theory that the jury's verdict, effectively finding that his victim both was subjected to forcible compulsion and was physically helpless, involved mutually exclusive factual findings. *Id.* at 938. However, the ACCA agreed with Lucas that the State had not presented evidence of forcible compulsion, as required to sustain his conviction for attempted sodomy in the first degree under § 13A-6-63(a)(1). *Id.* at 937-38. Therefore, the court of appeals reversed that conviction. Nevertheless, the court held the evidence supported that Lucas had committed the lesser-included offense upon which the

jury had been instructed, namely, attempted sexual misconduct, in violation of Ala. Code §§ 13A-6-65 and 13A-4-2. *Id.* Therefore, the court of appeals remanded the case with instructions to the trial court to enter a judgment finding Lucas guilty of that lesser-included offense and to resentence him accordingly. *Id.* at 938. On May 18, 2016, the ACCA issued a certificate of judgment pursuant to Rule 41, Ala. R. App. P. (Doc. 8-11).

### C. Resentencing and Motion to Modify Sentence on Remand

On remand, the state trial court held a resentencing hearing on May 26, 2016. (Doc. 8-13 at 62-70). The judge there verbally adjudged Lucas, still represented by attorney Jensen, guilty of attempted sexual misconduct and sentenced him to six months imprisonment on that conviction. The judge further stated that sentence would run concurrently with Lucas's previously-imposed sentence on the conviction for first-degree sexual abuse. (*Id*. at 66). Lucas's counsel thereupon asked the court to modify Lucas's sentence on that sexual-abuse charge, which, again, called for imprisonment of seven years, split to serve three and three years on probation. (*Id*. at 67). In support, counsel offered that Lucas, who had remained free on an appeal bond since being convicted, had been a "model prisoner," and that, as such, the court should suspend the remainder of the prison term and grant him probation. (*Id*.) The State objected to that proposal, and

the trial judge did not definitively rule on it at the hearing.  On May 31, 2016, however, the trial court entered a written order that both memorialized Lucas's conviction and six-month sentence for attempted sexual misconduct and summarily denied his motion to modify the split sentence on the sexual-abuse conviction. (Doc. 8-12).

On June 29, 2016, another attorney, Erin Atkins, filed a notice of appearance on behalf of Lucas.  (Doc. 8-13 at 46).  That same day, Atkins filed a "Motion to Alter, Amend or Vacate," again asking the court to modify Lucas's split sentence on the sexual abuse conviction.  (Doc. 8-13 at 47-49).  In that motion, Lucas highlighted that on that sentence he was to serve three years in prison and three years on probation, in addition to having to having served nine months with the Department of Corrections as well as about twenty months on house arrest with ankle monitoring.  (*Id.* ¶¶ 6, 7, 10).  Lucas argued that "such an extensive period of confinement (which is a cumulative amount of over seven and a half years) is incommensurate with the offense …., is greater than … the original sentence, and … is longer than necessary to serve the interests of justice …."  (*Id.* ¶ 10). Therefore, Lucas requested that the court impose a shorter prison split on the seven-year sentence, remove the split altogether, or place him on "Community Corrections" with full or partial credit for the time he spent on ankle monitoring.

(*Id.* at 48). On July 6, 2016, the trial court summarily denied Lucas's motion to set aside or otherwise reconsider his split sentence. (*Id.* at 55).

### D. Appeal After Remand

Meanwhile, on July 1, 2016, Lucas had filed a notice of appeal referencing the trial court's resentencing order of May 31, 2016. (Doc. 8-13 at 50). On the ensuing appeal to the ACCA, Lucas, now represented only by Atkins, raised three claims, as follows:

> 1. The circuit court lacked jurisdiction to split a 7-year sentence for conviction of a Class C felony to a 3-year period of incarceration since the execution of the 3-year split is illegal under the 2005 Amendment of the Split Sentence Act.
>
> 2. The defendant is entitled to a reduction in sentence when the reversal of one conviction has the effect of increasing the amount of time served toward his total sentence.
>
> 3. The defendant is entitled to receive credit toward his final sentence for the time he spent on electronic monitoring and strict house arrest during pre-trial and post-trial phases.

(Doc. 8-17 at 4). On March 17, 2017, the ACCA disposed of Lucas's appeal in an unpublished memorandum opinion. (Doc. 8-19); *Brian Frederick Lucas v. State of Alabama*, 242 So. 3d 240 (Ala. Crim. App. 2017) (table). The court of appeals prefaced its discussion by observing that Lucas could have raised his illegal-sentence claim regarding the sexual abuse conviction on his prior appeal but had failed to do so. (Doc. 8-19 at 4). The court did not rule that claim was

11

procedurally barred on that basis, however. Rather, the ACCA dismissed Lucas's appeal in its entirety on the ground that a defendant has no right under Alabama law to appeal a trial court's refusal to amend its original sentencing order imposing a split sentence to suspend the remainder of the period of confinement. (*Id.* at 4-6). Lucas filed an application for rehearing, which was denied on April 21, 2017. *Lucas v. State*, 246 So. 3d 981 (Ala. Crim. App. 2017) (table). He then filed a petition for certiorari in the Alabama Supreme Court, which was denied on June 9, 2017. *Ex parte Lucas*, 251 So. 3d 23 (Ala. 2017) (table). A certificate of judgment issued the same day. (Doc. 8-20).

### E.     Rule 32 Proceedings and State Collateral Appeal

Meanwhile, Lucas had also filed a *pro se* petition in the state trial court seeking postconviction relief pursuant to ALA. R. CRIM. P. 32. (Docs. 8-22 & 8-23). On May 19, 2017, the clerk of that court docketed that 101-page, typed petition (Doc. 8-22 at 2), noting that Lucas had paid the filing fee. (Doc. 8-21 at 4-5; *see also* Doc. 1-2 at 17). Lucas signed and dated his Rule 32 petition on May 17, 2017 (Doc. 8-23 at 47), which he alleges he mailed that day. (Doc. 1-2 at 17). In his Rule 32 petition, Lucas raised the thirteen[4] claims:

---

[4] Lucas's Rule 32 petition contains two "Grounds" for relief, with "Ground #1" being broken down into twelve enumerated "issues," and a "Ground #2" being a single double-jeopardy claim. Both the eighth and ninth "Issues" of Ground #1, however, are labeled as "Issue VIII." (Doc. 8-

1. Trial counsel rendered ineffective assistance by failing to rely on *Brady v. Maryland*, 313 U.S. 83 (1963) and its progeny to convince the trial court to grant discovery of an audiotaped statement of H.B. and by failing to object to the trial court's denial of same (Doc. 8-22 at 13-19);

2. The trial court erred by allowing testimony by M.C. of alleged collateral bad acts, in violation of Rule 404(b), Ala. R. Evid. (Doc. 8-22 at 20-28).

3. Trial counsel rendered ineffective assistance by failing to timely and adequately argue for the exclusion of M.C.'s testimony of collateral bad acts. (Doc. 8-22 at 29-40).

4. Trial counsel rendered ineffective assistance by failing to timely and adequately argue Ala. Code § 13A-6-66 is unconstitutionally vague, in violation of the Fourteenth Amendment's Due Process Clause. (Doc. 8-22 at 41-52).

5. Trial counsel rendered ineffective assistance by failing to timely and adequately object to impermissible bolstering of the victim's credibility through her mother's testimony as a violation of Rule 701, Ala. R. Evid. (Doc. 8-23 at 1-8).

6. Trial counsel rendered ineffective assistance by failing to timely and properly move for disclosure of the victim's audiotaped statements for impeachment purposes. (Doc. 8-23 at 9-13).

7. Trial counsel rendered ineffective assistance by failing to object to the impermissible bolstering of the victim's credibility through Investigator Chad Smith's testimony as a violation of Rule 701, Ala. R. Evid. (Doc. 8-23 at 14-19).

8. Trial counsel rendered ineffective assistance by failing to timely and properly object to testimony by Investigator Chad Smith that created the false impression that Lucas had avoided prosecution and

---

23 at 19, 25). And a result, his tenth, eleventh, and twelfth "issues" in Ground #1 are similarly mislabeled as "Issue IX," "Issue X," and "Issue XI," respectively.

may be a flight risk, thus inferring his consciousness of guilt. (Doc. 8-23 at 19-24).

9. Trial counsel rendered ineffective assistance by failing to timely and adequately argue for a judgment of acquittal based on insufficiency of the evidence to support the first-degree sodomy offense under Ala. Code §§ 13A-2-4(c) and 13A-6-60(8) because the overlap between the charges against him would have convinced the jury to acquit him of the first-degree sexual assault offense. (Doc. 8-23 at 25-30).

10. Trial counsel rendered ineffective assistance by failing to timely and adequately argue that his convictions for attempted sodomy in the first degree and sexual abuse in the first degree violated the Double Jeopardy Clause of the Fifth Amendment (Doc. 8-23 at 31-35).

11. Trial counsel rendered ineffective assistance by failing to request a jury instruction based on § 13A-4-2(c) in connection with the attempted first-degree sodomy offense. (Doc. 8-23 at 35-41).

12. Trial counsel rendered ineffective assistance by failing to request a written jury instruction on the definition of "mental incapacitation," as set out in Ala. Code §§ 13A-6-60(6) and 13A-6-66(a)(2), in the context of the first-degree sexual abuse offense. (Doc. 8-23 at 42-44).

13. The trial court was without jurisdiction and authority to convict and sentence him to imprisonment for both attempted sodomy in the first degree and sexual abuse in the first degree. (Doc. 8-23 at 45-47).

(Docs. 8-22 & 8-23).

The State moved to dismiss the Rule 32 petition. (Doc. 8-24). The next day, July 18, 2017, the circuit court entered a one-page order denying the petition without a hearing, stating summarily that Lucas's claims were procedurally precluded under Rule 32.2, Ala. R. Crim. P., or were without merit. (Doc. 8-25).

On July 29, 2017, Lucas mailed a motion to vacate and set aside that order pursuant to Rule 59(e), Ala. R. Civ. P. (Doc. 8-26 at 43). On August 23, 2017, Lucas filed a motion to expedite a ruling on the Rule 59 motion. (Doc. 8-27 at 1-5). At the same time, he also filed in the trial court a notice of appeal (*see* Doc. 8-21 at 5) and an application to proceed *in forma pauperis* ("IFP") on appeal (Doc. 8-28).

Upon receiving a copy of Lucas's notice of appeal, the ACCA issued a deficiency notice dated August 28, 2017, advising that, within 14 days, Lucas had to: (1) pay the $200 appellate docketing fee in full, or (2) provide the ACCA with proof that (a) the trial court had granted an application by him to proceed IFP on appeal or (b) he had an IFP application pending in the trial court. (Doc. 8-29). The next day, August 29, 2017, the trial judge entered an order advising Lucas that his application to proceed IFP on appeal would "not be considered until he has filed his Alabama Department of Corrections Average Inmate Deposit Balances for the past 12 months." (Doc. 8-30).

On September 6, 2017, the plaintiff filed another application to proceed IFP on appeal, this time directly in the ACCA. (Doc. 8-31). On September 21, 2017, that court issued an order notifying Lucas that his IFP application was deficient and requiring him to provide "a certificate of the warden or other appropriate

officer of the institution in which [he] was confined, stating the amount of money or securities on deposit to [his] credit in any account in the institution for the previous twelve months." (Doc. 8-32). That order further warned that Lucas's appeal would be dismissed if such documentation was not received within 14 days from the date of the order, *i.e.*, October 5, 2017. (*Id.*) Lucas claims that, in response, on September 28, 2017, he mailed to the ACCA "a copy of [his] P.M.O.D. [Prisoners' Money on Deposit] account attached as ordered." (Doc. 1-2 at 26). While Lucas has not provided this court with a copy of that document, he alleges that his prison "account printout showed that he had [only] $15.12 when he requested leave to proceed [IFP] on appeal …." (*Id.*) Lucas has also acknowledged, however, that he had received $1,224.00 in deposits to his prison account in the 12 months preceding his application to proceed IFP on appeal. (Doc. 10 at 117). On October 10, 2017, the ACCA issued an order summarily denying Lucas's IFP application and requiring him to pay the $200 appellate docket fee by October 24, 2017. (Doc. 8-33).

In response, on October 18, 2017, Lucas filed a petition for a writ of mandamus in the Alabama Supreme Court to compel the ACCA to allow him to proceed IFP on his state collateral appeal. (Doc. 10 at 101-124). He also moved in the Alabama Supreme Court for permission to proceed IFP on the mandamus

petition. (*Id.* at 137). On October 26, 2017, however, the ACCA entered an order dismissing Lucas's Rule 32 appeal for failure to pay the filing fee within the time allotted (Doc. 8-34); *Lucas v. State*, No. CR-16-1247, 268 So. 3d 638 (Ala. Crim. App. 2017) (table), accompanied by a certificate of judgment. (Doc. 10 at 127). On November 3, 2017, the Alabama Supreme Court granted Lucas's application to proceed IFP in relation to his mandamus petition. (*Id.* at 139). Ultimately, though, the Alabama Supreme Court entered a one-page order on January 29, 2018, summarily denying his mandamus petition. (*Id.* at 143). On February 12, 2018, Lucas filed a lengthy "petition for reconsideration or rehearing" (*id*. at 145-173), but the Alabama Supreme Court summarily denied it on March 13, 2018. (*Id.* at 175).

### F. Federal Habeas Petition

Lucas then filed his instant *pro se* federal habeas corpus petition pursuant to 28 U.S.C. § 2254. (Doc. 1). That filing was received and docketed by the clerk of this court on August 1, 2018 (*id*. at 1), but Lucas signed and dated it June 27, 2018 (*id*. at 6). In the petition and its accompanying supplement (Doc. 1-2)[5], which total a combined 182 pages, Lucas raises the same claims set forth above from his Rule

---

[5] The petition itself is Doc. 1. Lucas also filed a lengthy supplement further arguing and explicating his claims. That supplement was originally docketed as Doc. 1-1. However, the court discovered that several pages of the supplement were not scanned in Doc. 1-1, so the clerk re-scanned the petition and the supplement together, which are now designed on the docket sheet as Doc. 1-2. All pinpoint citations thereto are to the page of the electronically-filed document.

32 petition, plus five additional ones, namely, that (1) there was an absence of "available" and "effective" "State corrective process" to allow him to exhaust his claims, based on the Alabama courts' refusal to allow Lucas to proceed IFP on his state collateral appeal (Doc. 1-2 at 20-40); (2) his convictions for attempted sodomy in the first degree and for sexual abuse in the first degree violated double jeopardy (*id*. at 132-141); (3) the jury returned mutually exclusive verdicts of guilt (*id*. at 142-154); (4) the evidence was constitutionally insufficient to support his conviction for sexual abuse in the first degree (*id*. at 155-162); (4) he is entitled to relief "in light of newly discovered scientific evidence" (*id*. at 163-167); and (5) he is "actually and factually innocent" so his incarceration violates due process (*id*. at 168-176).

The State responded by filing a 73-page answer (Doc. 8), appending approximately 1,759 pages of records from the state court trial, appellate, and collateral proceedings. (Doc. 8-1 through 8-34). In its answer, the State denies Lucas is entitled to habeas relief, arguing that his claims for federal habeas relief are time barred, procedurally defaulted, meritless, or some combination thereof. On October 1, 2018, Lucas filed a traverse, comprised of a 29-page brief and another 146 pages of exhibits. (Doc. 10).

## II.    Statute of Limitations

The undersigned first considers the State's argument that Lucas's habeas petition is untimely. Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), habeas applications filed by state prisoners pursuant to 28 U.S.C. § 2254 are subject to a one-year statute of limitations that begins to run from the latest of four dates:

> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). However, the "time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under [§ 2244(d)(1)]." 28 U.S.C. § 2244(d)(2).

The State argues Lucas's habeas claims are governed by § 2244(d)(1)(A) and that the statute-of-limitations clock thus commenced when his conviction

became final.  The State posits that to have occurred on August 16, 2016, ninety days after the ACCA issued its certificate of judgment concluding Lucas's initial direct appeal, on May 18, 2016.  The State further asserts Lucas's litigation of his "June 29, 2016 motion to modify his split sentence for first-degree sexual assault did not subsequently toll the running of the statute of limitations."  (Doc. 8 at 54, ¶ 58).  The State acknowledges that Lucas's filing his petition for post-conviction relief under Rule 32, Ala. R. Crim. P., could toll the limitations period under § 2244(d)(2) from the time he filed that petition until his appeal from the denial thereof was dismissed by the ACCA on October 26, 2017.  (*Id*.)  And the State insists that the statute of limitations expired before Lucas filed his federal habeas petition, which the State says happened on August 1, 2018.  (*Id*.)  The State's calculation of the running of the limitations period under § 2244(d)(1)(A), however, is erroneous, as explained below.

The Supreme Court has recognized that, for purposes of § 2244(d)(1)(A), the final judgment means the sentence.  *Burton v. Stewart*, 549 U.S. 147, 156 (2007).  As such, where a convicted defendant is successful in obtaining a resentencing, whether on direct appeal or in collateral proceedings, the entry of the new sentence constitutes a new judgment, and the statute of limitations under § 2244(d)(1)(A) does not begin to run on federal habeas claims attacking that judgment until it

becomes final.  *See id.* at 156-57; *Robbins v. Secretary for Dep't of Corr.*, 483 F.3d 737, 738-39 (11th Cir. 2007); *Hepburn v. Moore*, 215 F.3d 1208, 1209 (11th Cir. 2000); *cf. Magwood v. Patterson*, 561 U.S. 320, 342 (2010) (holding that a petitioner's § 2254 habeas application was not a "second or successive" application under 28 U.S.C. § 2244(b) because it was the first to challenge the new judgment arising from his resentencing).  Indeed, that rule applies in this circuit even if the petitioner's habeas claims challenge only the underlying conviction and not any aspect of his resentencing.  *Ferreira v. Secretary, Dep't of Corr.*, 494 F.3d 1286, 1292-93 (11th Cir. 2007); *Thompson v. Florida Dep't of Corr.*, 606 F. App'x 495, 505 (11th Cir. 2015); *cf. Insignares v. Secretary, Fla. Dep't of Corr.*, 755 F.3d 1273, 1281 (11th Cir. 2014) ("When a habeas petition is the first to challenge a new judgment [following a resentencing], it is not 'second or successive' [under § 2244(b)], regardless of whether its claims challenge the sentence or the underlying conviction.").  Likewise, where a defendant is initially convicted and sentenced on multiple counts in a single judgment, if his conviction or prison sentence is later invalidated as to one or more counts, his resentencing creates a new judgment resetting the limitations period of § 2244(d)(1)(A) as to the convictions and sentences on all counts.  *See Everett v. Secretary, Fla. Dep't of Corr.*, 2019 WL 118016, *3-4 (M.D. Fla. Jan. 7, 2019); *see also Fritts v. Jones*, 2015 WL 4873646,

*2 (N.D. Fla. Aug. 13, 2005) (holding that, where state appellate court vacated one of two convictions and instructed trial court to enter a conviction and resentencing on a lesser-included offense, the conviction became final after he was resentenced on remand); *Maharaj v. Sec'y for Dep't of Corr.*, 304 F.3d 1345, 1348 (11th Cir. 2002) (where petitioner was originally convicted on multiple counts but was still awaiting resentencing on one of them, the judgment was not yet final for habeas purposes, so his § 2254 petition challenging all convictions and sentences was not ripe for review); *cf. Rocha v. Secretary, Fla. Dep't of Corr.*, 692 F. App'x 576, 578 (11th Cir. 2017) (holding that where petitioner was convicted on two counts in one judgment, subsequent resentencing on one count gave rise to a new judgment for purposes of habeas claims related to both counts, defeating argument that petition was second or successive under § 2244(b) to the extent it included claims attacking "undisturbed" conviction and sentence); *McCloud v. Hooks*, 560 F.3d 1223, 1229-30 (11th Cir. 2009) (holding that limitations period of § 2254(d)(1)(A) was triggered separately for claims challenging guilty-plea burglary conviction and those challenging later conviction at trial for capital murder; while both counts were originally in same indictment, the trial court sentenced the defendant at separate times and had entered separate judgments).

Lucas was initially convicted at trial and sentenced on two counts: attempted sodomy in the first degree and sexual abuse in the first degree. On direct appeal, the conviction and sentence for the latter offense were affirmed, but the conviction and sentence on the former were reversed for insufficient evidence, with the ACCA remanding the case to the trial court with instructions to enter a conviction on a lesser-included offense, attempted sexual misconduct, and to resentence Lucas accordingly. The trial court then carried out that mandate on remand. Under the legal principles set forth above, the state trial court's act resentencing of Lucas following his initial direct appeal created as a new judgment for purposes of establishing the finality of both of his convictions and sentences under § 2244(d)(1)(A). The State is therefore wrong that the commencement of the federal limitations period might be tied to the Alabama Court of Criminal Appeals' opinion or the certificate of judgment on Lucas's initial direct appeal or the 90-day period in which he might have thereafter sought to file a petition for certiorari in the Supreme Court of the United States.[6]

---

[6] Where an Alabama state prisoner's direct appeal terminates in the Alabama Supreme Court but he does not seek review in the United States Supreme Court, his conviction becomes final for purposes of § 2244(d)(1)(A) upon the expiration of the 90-day period in which he could have filed a timely petition for certiorari in the United States Supreme Court. *See Arthur v. Thomas*, 739 F.3d 611, 618 (11th Cir. 2014); *Bond v. Moore*, 309 F.3d 770, 773 (11th Cir. 2002). The State's calculation of the limitations period here assumes Lucas is entitled to the benefit of that 90-day period, running from the ACCA's issuance of a certificate of judgment on Lucas's initial direct appeal on May 18, 2016. However, Lucas did not seek certiorari review in the Alabama Supreme Court following the ACCA's ruling on his initial direct appeal, so even if the finality of

Because Lucas's resentencing created a new judgment, the next question is: "When did that judgment become final?" Under § 2244(d)(1)(A), the limitations period begins to run on the date the petitioner's conviction becomes "final by the conclusion of direct review or the expiration of the time for seeking such review." Assuming a petitioner timely pursues all available state and federal relief, his conviction becomes final for purposes of the limitations period when the Supreme Court denies or rules on the merits of his certiorari petition. *See Phillips v. Warden*, 908 F.3d 667, 670 (11th Cir. 2018) (*citing Gonzalez v. Thaler*, 565 U.S. 134, 149-50 (2012)). If the petitioner timely pursues all available state relief on direct review but does not file a petition for certiorari to the United States Supreme Court, his conviction becomes final at the expiration of the period for filing such a petition. *See id.* But if the petitioner fails to timely pursue all available state relief

---

his conviction were linked to the ACCA's opinion, Lucas would not be eligible for certiorari review in the United States Supreme Court, meaning he would not be entitled to the additional 90 days before his state conviction became final. *See McMillian v. Peters*, 2018 WL 4599653, at *1 n. 1 (11th Cir. Mar. 7, 2018) (*citing Pugh v. Smith*, 465 F.3d 1295, 1300 (11th Cir. 2006)). Rather, where a direct appeal terminates short of the State's highest court, the conviction becomes final upon the expiration of the deadline for taking the next procedural step required for seeking further state-court review. *See Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Finally, the 90-day filing period for a certiorari petition in the United States Supreme Court runs from the date of the judgment or order to be reviewed, not from the issuance of the state-court appellate mandate, *Chavers v. Secretary, Fla. DOC*, 468 F.3d 1273, 1275 (11th Cir. 2006), the equivalent of which in Alabama is the certificate of judgment. *See* Rule 41, Ala. R. App. P.; Committee Comments to Rule 36, Ala. R. App. P.; *Hammonds v. Commissioner, DOC*, 822 F.3d 1201, 1207 (11th Cir. 2016).

on direct review, his conviction becomes final when the time for seeking review in the relevant state court expires. *See id.*

The state trial court held a hearing on May 26, 2016, at which it verbally resentenced Lucas to six months imprisonment for the attempted sexual misconduct conviction, to run concurrently with the previously-imposed split sentence on the first-degree sexual abuse count. On May 31, 2016, the court issued a written resentencing order formally recognizing those terms. After being resentenced, Lucas had 42 days in which to file another direct appeal. Rule 4(b)(1), Ala. R. App. P.; *Miller v. Alabama*, 2018 WL 7503907, *2 (11th Cir. Aug. 3, 2018). On July 1, 2016, Lucas filed a notice of appeal referencing the trial court's resentencing order of May 31st. So even assuming Lucas might be deemed to have been resentenced at the hearing on May 26th, his notice of appeal was filed within the 42-day deadline.

Ultimately, the Alabama Court of Criminal Appeals dismissed Lucas's appeal on March 17, 2017, concluding it lacked statutory authority to hear the particular type of claims he raised, which the appellate court interpreted as challenging the trial court's refusal to modify his earlier split sentence. However, where an appellate court involuntarily dismisses a defendant's timely direct appeal, the Eleventh Circuit has recognized that the conviction is not final for habeas

purposes until at least the time of the dismissal. *See Stewart v. United States*, 646 F.3d 856, 857 (11th Cir. 2011) (for purposes of analogous one-year limitations period of 28 U.S.C. § 2255(f)(1), federal conviction was final 90 days after direct appeal dismissed based on appeal-waiver provision in plea agreement); *Roberts v. Secretary, Dep't of Corr.*, 2018 WL 4352792, at *1 (11th Cir. Aug. 29, 2018) (conviction became final 90 days after state appellate court denied motion to reinstate direct appeal that had been previously dismissed for failure to pay appellate docketing fee); *King v. Secretary, Fla. Dep't of Corr.*, 2017 WL 6760186, at *2 (11th Cir. Jan. 5, 2017) (indicating conviction became final 90 days after state appellate court dismissed direct appeal for failure to timely file appellate brief). Following the ACCA's dismissal opinion, Lucas filed an application for rehearing in that court, and then, when it was denied, a petition for certiorari in the Alabama Supreme Court. There is no claim by the State, nor does it otherwise appear from the record, that either filing was untimely. *See generally* Rule 40(c), Ala. R. App. P. (requiring an application for rehearing to be filed within 14 days of the appellate decision); Rule 39(c)(2), Ala. R. App. P. (requiring a petition for certiorari in a criminal case to be filed within 14 days of the denial of rehearing by the ACCA). The Alabama Supreme Court denied certiorari and a certificate of judgment issued on June 9, 2017. Therefore, the judgment that Lucas attacks in

this habeas action did not become final until 90 days later, on September 7, 2017, upon the expiration of the period in which Lucas could have filed a timely certiorari petition in the United States Supreme Court. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). By that measure, the federal habeas limitations period expired one year later, on September 7, 2018. However, under the "prison mailbox rule," *see Houston v. Lack*, 487 U.S. 266 (1988), Lucas's *pro se* § 2254 habeas petition would be deemed filed as of July 27, 2018, the date he signed and dated it. *See McCloud*, 560 F.3d at 1227. But even using the date the clerk formally docketed the petition, August 1, 2018, Lucas's petition is timely, even with no tolling.[7]

---

[7] For good measure, it appears that Lucas is entitled to a period of statutory tolling under 28 U.S.C. § 2244(d)(2). Before the Alabama Supreme Court denied Lucas's petition for certiorari concluding the state direct appeal following his resentencing, Lucas had already filed a Rule 32 petition in the state trial court, no later than May 19, 2017. The State does not dispute that such petition was properly filed for purposes of § 2244(d)(2). As a result, Rule 32 petition filing would toll the limitations period, assuming it had not expired previously. *See McCloud*, 560 F.3d at 1227. Indeed, no time at all would have come off § 2241(d)(1)'s one-year clock at that point because, as explained in the text, Lucas's direct appeal following his resentencing was not final until September 7, 2017. The State also does not dispute that Lucas's Rule 32 application would have remained pending in the state courts for purposes of § 2244(d)(2) until at least October 26, 2017, when the ACCA dismissed Lucas's collateral appeal and issued a certificate of judgment, based on his failure to pay the appellate docket fee. (Doc. 8 at 55, ¶ 58). Under that scenario, which affords Lucas no additional tolling for his unsuccessful mandamus petition in the Alabama Supreme Court seeking to compel the ACCA to allow him to proceed IFP on his Rule 32 appeal, the limitations period of § 2244(d)(1)(A) would have not have expired until October 26, 2018. Again, Lucas filed his § 2254 petition no later than August 1, 2018.

## III.    Review Standards

A district court is authorized to grant federal habeas relief to a state prisoner who establishes that he is in custody in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a).  However, such relief is not available for errors of state law unless such error also gives rise to a violation of federal law.  *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  Further, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'"  *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Lee v. Kemna*, 534 U.S. 362, 375 (2002)); *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977).

Also, a state prisoner is generally ineligible for habeas relief under § 2254 unless he has first exhausted the remedies available in the courts of the State of conviction.  28 U.S.C. § 2254(b)(1)(A); *Kelley v. Secretary for Dept. of Corr.*, 377 F.3d 1317, 1343-44 (11th Cir. 2004).  As a matter of comity, the rule requires the federal courts to allow the states the initial "opportunity to pass upon and correct errors of federal law in the state prisoner's conviction."  *Fay v. Noia*, 372 U.S. 391, 438 (1963).  "[C]onsistent with the longstanding requirement that habeas

petitioners must exhaust available state remedies before seeking relief in federal court, ... when a petitioner fails to raise his federal claims in compliance with relevant state procedural rules, the state court's refusal to adjudicate the claim ordinarily qualifies as an independent and adequate state ground for denying federal review." *Cone*, 556 U.S. at 465 (citing *Coleman*, 501 U.S. at 731).

The exhaustion requirement is not satisfied until the claim has been fully and fairly presented to the state courts for consideration. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Heath v. Jones*, 863 F.2d 815, 818 (11th Cir. 1989). To do so, a state prisoner must present any federal constitutional or statutory claim through one complete round of the State's trial and appellate review process, either on direct appeal or in State post-conviction proceedings, *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), which in Alabama includes presentation to the Alabama Supreme Court. *See Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003); *Smith v. Jones*, 256 F.3d 1135, 1140-41 (11th Cir. 2001). Where a claim has not been exhausted in the State courts and the time in which to present the claim there has expired, the claim is procedurally defaulted and habeas review in the federal courts is generally precluded. *See Coleman v. Thompson*, 501 U.S. 722, 735 n. 1 (1991); *McNair v. Campbell*, 416 F.3d 1291, 1305 (11th Cir. 2005).

Where a state prisoner has procedurally defaulted a federal claim in the state courts, either because of a state-law procedural bar or a want of exhaustion, a petitioner is entitled to federal habeas review on the merits of any such claim only upon a showing of either (1) "cause" for the default *and* resulting "prejudice," *or* (2) that failure to review the claim will result in a "fundamental miscarriage of justice." *See Spencer v. Secretary, Dep't of Corr.*, 609 F.3d 1170, 1179-80 (11th Cir. 2010); *In re Davis*, 565 F.3d 810, 821 (11th Cir. 2009). "To establish 'cause' for procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (quotation marks and citation omitted); *see also Murray v. Carrier*, 477 U.S. 478, 488 (1986). "To establish 'prejudice,' a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Henderson*, 353 F.3d at 892 (citation omitted). The "miscarriage of justice" exception applies "where a constitutional violation has resulted in the conviction of someone who is actually innocent." *House v. Bell*, 547 U.S. 518, 536 (2006) (citation omitted). "[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable

doubt.'" *Id.*, 547 U.S. at 536-37 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Even where this court is authorized to review a federal claim on the merits, the scope of review may be limited significantly by AEDPA. *See* 28 U.S.C. § 2254; *Williams v. Taylor*, 529 U.S. 362, 402-03 (2000). Where a claim was adjudicated on the merits in state court, habeas relief under § 2254 is precluded unless the state court's adjudication of the claim resulted in a decision that was either (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Further, factual determinations by state courts are presumed correct, subject to being rebutted only upon a showing by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

The Supreme Court has explained that "[a] state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citing *Williams*, 529 U.S. at

31

405; *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)).  The Supreme Court has likewise stated that "[a] state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner." *Id.* (citing *Williams*, 529 U.S. at 405; *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)).  The phrase "clearly established Federal law" in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of the decisions of the United States Supreme Court, in precedent issued at the time the state court rendered its decision.  *Carey v. Musladin*, 549 U.S. 70, 74 (2006); *Yarborough v. Alvarado*, 541 U.S. 652, 660-661 (2004); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003); *see also Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998) ("[A] district court evaluating a habeas petition under § 2254(d) should survey the legal landscape at the time the state court adjudicated the petitioner's claim to determine the applicable Supreme Court authority" (internal quotation marks and citation omitted), overruled on other grounds by *Williams*, as stated in *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001)).  By contrast, "clearly established Federal law" does not include decisions of lower federal courts.  *Renico v. Lett*, 559 U.S. 766, 778-79 (2010).

"AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the

doubt." *Renico*, 559 U.S. at 773 (citations and internal quotation marks omitted).

For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is

different from an *incorrect* application of federal law." *Harrington v. Richter*, 562

U.S. 86, 101 (2011) (quoting *Williams*, 529 U.S. at 410 (emphasis original)).

"Indeed, 'a federal habeas court may not issue the writ simply because that court

concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly.'" *Renico*, 559 U.S. at

773 (quoting *Williams*, 529 U.S. at 411). Rather,

> [a] state court's determination that a claim lacks merit precludes
> federal habeas relief so long as "fairminded jurists could disagree" on
> the correctness of the state court's decision. *Yarborough v. Alvarado*,
> 541 U.S. 652, 664 (2004). ... "[E]valuating whether a rule application
> was unreasonable requires considering the rule's specificity. The
> more general the rule, the more leeway courts have in reaching
> outcomes in case-by-case determinations." *Ibid.* "[I]t is not an
> unreasonable application of clearly established Federal law for a state
> court to decline to apply a specific legal rule that has not been
> squarely established by this Court." *Knowles v. Mirzayance*, 556 U.S.
> 111, 122 (2009) (internal quotation marks omitted).

*Harrington*, 562 U.S. at 786. Likewise, "a state-court factual determination is not

unreasonable [for purposes of § 2254(d)(2)] merely because the federal habeas

court would have reached a different conclusion in the first instance." *Wood v.

Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the

record might disagree' about the finding in question, 'on habeas review that does

not suffice to supersede the [state] trial court's ... determination.'" *Id.* (quoting

*Rice v. Collins*, 546 U.S. 333, 341-342 (2006)).

## IV.    Discussion of the Claims

### A.    "State Corrective Process" (Petition Issues I & II)

The first two issues Lucas identifies in his supplement as "reasons why [his]

28 U.S.C. § 2254 habeas corpus [petition] should be granted" both have to do with

alleged inadequacies in Alabama's "State corrective process." (*Id.* at 14, 28).

Both claims boil down to challenges to the Alabama state courts' refusal to grant

him IFP status on his state collateral appeal, despite his alleged indigency, and to

the ACCA's associated dismissal of that appeal because of his failure to pay the

appellate docket fee. (*See id.* at 14-34).  Such arguments may be relevant to rebut

contentions by the State that Lucas has procedurally defaulted other claims for

habeas relief by failing to properly present and exhaust them in the Alabama

appellate courts on his state collateral appeal.[8]  *See* 28 U.S.C. § 2254(b)(1)

---

[8] Indeed, the State argues that, even to the extent Lucas may have otherwise properly raised claims in his Rule 32 petition, those claims are procedurally defaulted because the ACCA dismissed Lucas's state collateral appeal for failure to pay the docket fee.  Lucas argues that such dismissal violated his constitutional rights because he was indigent and thus entitled to proceed IFP, precluding or excusing any putative procedural default.  *Cf. Long v. District Court of Iowa, in & for Lee Cty.*, 385 U.S. 192, 194-95 (1966) (holding that State violated equal protection by refusing to furnish indigent prisoner with transcript of state habeas proceeding for purposes of appeal); *Clifton v. Carpenter*, 775 F.3d 760, 767-68 (6th Cir. 2014) (holding that refusal of state court to accept prisoner's petition challenging his parole revocation, based on state statute requiring prisoners to pay all unpaid court costs before being allowed to file a lawsuit or appeal, violated indigent prisoner's constitutional rights and thus could not serve as adequate and

(providing that a state prisoner seeking federal habeas relief must have exhausted

available in the State courts or it must appear that "there is an absence of available

State corrective process" or that "circumstances exist that render such process

ineffective to protect the rights of the applicant"); *Breazeale v. Bradley*, 582 F.2d

5, 6 (5th Cir. 1978).[9]  However, a state criminal judgment becomes final and valid

---

independent state-law ground precluding federal habeas review).  That procedural default issue raises a substantial constitutional question, insofar as it appears undisputed that, at the time he applied for leave to proceed IFP on his Rule 32 appeal, Lucas had only $15.12 in his prisoner account and was thus not able to afford the $200 appellate docket fee.  Rather, it appears that the Alabama courts applied a state rule authorizing summary denial of a prisoner's IFP application despite a present inability to pay because the prisoner had received "substantially more" than the amount of an applicable filing fee in deposits to his prison account during the preceding twelve months.  *See Ex parte Wyre*, 74 So. 3d 479, 482 (Ala. Crim. App. 2011); *Ex parte Cook*, 202 So. 3d 316, 320-21 (Ala. 2016); *see also Windham v. Davenport*, 2017 WL 6060896, at *8-9 (M.D. Ala. Aug. 14, 2017), *report and recommendation adopted sub nom. Windham v. Strange for Alabama*, 2017 WL 6061021 (M.D. Ala. Dec. 7, 2017).  Lucas acknowledges that, in his case, the amount of prior annual deposits to his prison account was approximately $1,224.  The Eleventh Circuit has yet to examine Alabama's "look back" or "could have saved" approach to assessing prisoner IFP applications, but members of other federal and state courts in Alabama have expressed concerns over its legality, as least if applied across the board.  *See Ex parte Johnson*, 123 So. 3d 953, 953 (Ala. 2013) (Murdock, J., concurring specially); *id.* at 953-54 (Moore, C.J., dissenting); *Windham*, 2017 WL 6060896, at *9; *Baker v. Alabama*, 2017 WL 3205778, at *1 n. 1 (N.D. Ala. May 3, 2017), *report and recommendation adopted*, 2017 WL 3191157 (N.D. Ala. July 27, 2017); *also cf. Collier v. Tatum*, 722 F.2d 653, 655-57 (11th Cir. 1983) (interpreting the federal IFP statute, 28 U.S.C. § 1915, as allowing a district court to deny a prisoner IFP application based on consideration of decrease in prison account balance but suggesting that the court must be able to conclude that the purpose of withdrawals appeared intended to avoid payment of filing fees and that prisoners must be given a reasonable opportunity to explain withdrawals).  Ultimately, however, it is unnecessary for this court to confront the issue here, because, as explained in the text, all of the claims that the State contends Lucas defaulted by virtue of the dismissal of his state collateral appeal are procedurally defaulted on other grounds (*e.g.*, they were barred from collateral review under Rule 32.2, Ala. R. Crim. P.) or are due to be denied on the merits.

[9] Published decisions of the former Fifth Circuit handed down before October 1, 1981 are binding precedent in the Eleventh Circuit.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

before State postconviction review proceedings occur. Accordingly, defects in

postconviction proceedings do not undermine the integrity of the conviction or

sentence, so they cannot themselves serve as the basis for federal habeas relief.

*See Carroll v. Secretary, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009); *Quince v.

Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004); *Littleton v. Carter*, 2016 WL

7972059, at \*14 (N.D. Ala. Nov. 28, 2016), *report and recommendation adopted*,

2017 WL 283257 (N.D. Ala. Jan. 23, 2017); *accord Lambrix v. Secretary, Fla.

DOC*, 756 F.3d 1246, 1263 (11th Cir. 2014) ("A habeas petitioner cannot assert a

viable, freestanding claim for the denial of the effective assistance of state

collateral counsel in post-conviction proceedings."). Thus, to the extent Lucas

might conceive his arguments related to alleged infirmities in Alabama's "State

corrective process" as raising independent claims for habeas relief, they are due to

be denied.

### B. Insufficiency of the Evidence (Petition Issue VI)

The undersigned next turns Lucas's claim alleging that the evidence was

constitutionally insufficient to sustain his conviction for sexual abuse in the first

degree. It is a violation of the Due Process Clause of the Fourteenth Amendment

to convict a criminal defendant absent evidence from which a rational trier could

have found all essential elements of the offense beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  In performing that analysis, a court looks to state law to determine the elements of the offense but the minimum amount of evidence required to meet due process standards as it relates to proving those elements is purely a matter of federal law.  *Coleman v. Johnson*, 566 U.S. 650, 655 (2012).

To convict Lucas of first-degree sexual abuse under the applicable statutory subsection, the State was required to prove he "subject[ed]" H.B. to "sexual contact" and that H.B. was "incapable of consent by reason of being physically helpless or mentally incapacitated."  Ala. Code § 13A-6-66(a)(2).  Several of those terms are further defined by statute, as follows:

> (3)  SEXUAL CONTACT.   Any touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party.
>
> * * *
>
> (6)  MENTALLY INCAPACITATED.   Such term means that a person is rendered temporarily incapable of appraising or controlling his conduct owing to the influence of a narcotic or intoxicating substance administered to him without his consent, or to any other incapacitating act committed upon him without his consent.
>
> (7)  PHYSICALLY HELPLESS.   Such term means that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act.

Ala. Code § 13A-6-60.

Under the State's theory, Lucas committed the offense by rubbing or otherwise touching H.B.'s upper lip and the base of her nose with his penis while she was sleeping. Lucas insists, however, that the evidence is insufficient under *Jackson* to support that he engaged in that conduct. At the outset, Lucas urges that the State's case hinged on H.B.'s testimony because there was no other eyewitness to the offense and the State tried but failed to collect any corroborating forensic evidence. Lucas points out that, while H.B. testified that she felt "something" rubbing against her upper lip and the base of her nose, she acknowledges she had been sleeping, and she did not claim to have seen what was touching her as it was occurring. Indeed, Lucas highlights that, under the State's own theory, H.B. was "physically helpless" because she was "unconscious" when Lucas subjected her to sexual contact, so, according to Lucas, even H.B. herself would have been engaging in speculation and guesswork as to just what was touching her face.

This claim is procedurally defaulted. Lucas did not argue in the Alabama state courts that the evidence did not reasonably allow a finding, as a factual matter, that he touched H.B.'s upper-lip area with his penis, and he certainly made no such claim based specifically on the Due Process Clause, *Jackson*, or federal law otherwise.[10]  *See Preston v. Secretary, Fla. DOC*, 785 F.3d 449, 457-62 (11th

---

[10] Lucas did argue in the ACCA on direct appeal that the evidence was insufficient to sustain this conviction and that the trial court thus should have granted his motion for judgment of acquittal

Cir. 2015) (defendant failed, for purposes of exhaustion requirement under §

2254(b), to give fair notice to the Florida state courts that his insufficiency-of-the-

evidence claim was based on federal due process principles where he only cited

state-law cases and did not cite the United States Constitution or rely on federal

caselaw).  Nor did Lucas seek certiorari review in the Alabama Supreme Court on

his initial direct appeal with respect to the ACCA's rejection of his claim that the

evidence was insufficient to support his first-degree sexual abuse conviction.  That

would operate as a procedural default under *O'Sullivan* and *Pruitt*.  But even if

Lucas has not procedurally defaulted this claim or that he might overcome the

default, the claim is due to be denied on the merits, as explained below.

"*Jackson* claims face a high bar in federal habeas proceedings."  *Coleman*,

566 U.S. at 651.  "Under *Jackson*, evidence is sufficient to support a conviction if,

'after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt."  *Id.* at 654 (quoting *Jackson*, 443 U.S. at 319 (emphasis in

---

on the charge.  However, that claim was based on the argument that a victim's upper-lip area is
not included within the "sexual or other intimate parts of a person" under § 13A-6-60(3) such
that the act of touching that area, even with one's penis, does not qualify as "sexual contact" for
purposes of § 13A-6-66(a)(2).  (*See* Doc. 8-8 at 51-59); *Lucas*, 204 So. 3d at 933-35.  The
ACCA disagreed, holding that Lucas's conduct shown by the evidence qualified as having
subjected H.B. to "sexual contact" under the statute.  But the point here is that Lucas's
insufficiency claim in the ACCA was a purely legal one, based on how to interpret § 13A-6-
66(a)(2).  As such, that claim is materially distinct from Lucas's present one, that the evidence
was constitutionally insufficient to allow a finding, as a factual matter, that he touched H.B.'s
upper-lip area with his penis.

*Coleman*).  Thus, "the assessment of the credibility of witnesses is generally beyond the scope of review."  *Schlup*, 513 U.S. at 330.  Further, "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman*, 566 U.S. at 655 (quoting *Jackson*, 443 U.S. at 319).   In other words, a jury's factual findings will be upheld unless "so unsupportable as to fall below the threshold of bare rationality."  Id. at 656.

At trial, H.B. gave the following account of the incident that gave rise to the charges against Lucas:

> A.  While I was asleep I felt something agitating my face, rubbing it. It was kind of like when you're half asleep and you can hear your alarm going off but you don't really want to wake up, and I slowly started to wake up.  I could feel it the whole time.
>
> Q.  And when you say feel it, tell me where you were feeling it?
>
> A.  Around the base of my nose and my upper lip.
>
> Q.  Okay.  All right.
>
> * * *
>
> A.  And I woke up and saw a penis in my face and … and a hand holding it.  And so I pulled back and covered my hands my mouth with my hands and this man took a step back from my bed but was still facing me, and I could see his silhouette, I could tell he had no hair and I could see his belt was undone and his pants were around his hips.

* * *

Q. Okay. And … it appeared like it was erect, is that fair to say?

A. Yes.

* * *

Q. Okay. All right. What happened after that?

A. We were staring at each other. I was trying to figure out who he was …. And we just kept staring at each other. And I was kind of just -- I didn't know if I should scream or fight, I was just kind of –

Q. Let me ask you about that. When you first woke up and you had your hands on your face, how did you feel?

A. Pretty terrified because I didn't know who he was or why it happened.

Q. Okay. Then what happened next?

A. I was kind of just waiting on him to do something, say something, but nothing was ever said, you know.

* * *

Q. Okay. All right. So after that what happened next?

A. After we were staring at each other for maybe ten seconds, fifteen seconds, he turned around and started walking out of my door and I heard him buckling his belt. And he left my door open. And I heard him walk around into my mom's room and I had decided I needed to figure out who this was, so I got up and followed him in there and my mom's light was off, and so I turned it on and I saw him on the right side of the bed, he was like leaning over the bed. … And then when I turned the light on he kind [sic] of stood back up and we looked at each for about two or three seconds, and I saw what he was wearing

41

and I turned the light back off and went back to my room and locked
the door.

Q. Okay. Now let me ask you this. When you turned that light on,
did you recognize who it was?

A. Yes.

Q. And who was it?

A. Brian Lucas.

(R. 173-177, Doc. 8-4 at 105-109).

Thus, H.B.'s trial testimony was that, as she was asleep in her bed, she felt

something agitating her upper lip area; that it led her slowly to awake; and that, as

she opened her eyes, she saw the silhouette of a man with no hair standing in her

darkened room with his pants down, holding his penis right next to her face. It

rather plainly involved no undue speculation or unwarranted leap of logic or reason

for the jury to infer that the object that had been touching H.B.'s face was, in fact,

the man's penis. Indeed, it's an entirely a common-sense deduction. And while

H.B. admitted she could not identify the man initially as he stood in her dark room,

she testified that when he walked out after a few moments, she followed him down

to her mother's room a few seconds later, turned on the light, and saw Lucas, a

man whom she had known for years. In short, H.B.'s testimony is enough under

*Jackson* from which the jury could find that Lucas had rubbed H.B.'s upper-lip

area with his penis as she slept, even if her account was not corroborated by testimony from another eyewitness to the incident or by forensic evidence. *See Braxton v. Estelle*, 641 F.2d 392, 395-96 (5th Cir. Unit A April 1981) (holding that victim's testimony that the petitioner had sexual intercourse with her without her consent was sufficient to support rape conviction, despite the fact that a doctor's examination of the victim "revealed only blood type A in the vagina region" and the petitioner had type O blood); *Duran v. Walker*, 223 F. App'x 865, 872-73 (11th Cir. 2007) (holding that "the victim's testimony as to forcible penetration was alone sufficient to support the [petitioner's rape] conviction, … even though the medical expert testified that she did not find semen on the victim and could not link the victim's wounds directly to [the petitioner]."); *see also Wright v. West*, 505 U.S. 277, 284, 295-97 (1992) (holding that evidence was sufficient under *Jackson* to convict the petitioner of grand larceny, despite the court of appeals' citation to a lack of "corroborating evidence (such as fingerprints or eyewitness testimony)"); *Tibbs v. Florida*, 457 U.S. 31, 45 n. 21 (1982) (noting that rape victim "provided eyewitness testimony to the [petitioner's] crimes" of rape and murder; "If the jury believed her story, the State's presentation was more than sufficient to satisfy due process."). This claim is due to be denied.

## C.    "Newly Discovered Evidence"/"Actual/Factual Innocence" (Petition Issues VII & VIII)

The undersigned next considers the last two issues in Lucas's habeas petition together, which both revolve around a contention that he is "actually innocent," particularly in light of certain "newly discovered evidence."  However, to the extent that Lucas conceives such claims as entitling him to federal habeas relief on the basis that they might demonstrate his innocence, they fail out of the gate. Federal habeas relief is not available on a freestanding claim of actual innocence in non-capital cases; rather, such a showing might only serve as a gateway to allow a federal court to conduct a review on the merits of some other, time barred or procedurally defaulted, independent claim alleging that his state criminal trial or direct appeal was infected by a federal constitutional violation.  *See Herrera v. Collins*, 506 U.S. 390, 400-02 (1993); *Raulerson v. Warden*, 928 F.3d 987, 1004 (11th Cir. 2019); *Jordan v. Secretary, DOC*, 485 F.3d 1351, 1356 (11th Cir. 2007)); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002); *Swindle v. Davis*, 846 F.2d 706, 707 (11th Cir. 1988) ("Newly discovered evidence which goes only to the guilt or innocence of the petitioner is not sufficient to require habeas relief.").  Thus, Lucas's claims of "newly discovered evidence" and "actual/factual innocence" are due to be denied insofar as they are presented as independent claims for federal habeas relief.

Nevertheless, the State has also argued that Lucas has procedurally defaulted all claims for habeas relief he raises in this court. In response, Lucas maintains he has demonstrated actual innocence entitling him to review of the merits of any federal claims that might have been procedurally defaulted. *See House*, 547 U.S. at 536-37; *Schlup*, 513 U.S. at 327; (Doc. 1-2 at 174). Accordingly, it is appropriate to consider whether Lucas has established such a "gateway" claim of actual innocence. But as explained below, Lucas comes nowhere close to doing so.

Under the "fundamental miscarriage-of-justice" exception, "prisoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 536-37 (quoting *Schlup*, 513 U.S. at 327. This standard "is demanding and permits review only in the 'extraordinary' case." *Schlup*, 513 U.S. at 327 (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)). "'[T]o be credible' a gateway claim requires 'new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *House*, 547 U.S. at 537 (quoting *Schlup*, 513 U.S. at 324). The district court then considers "all of the evidence, old and new, incriminating and exculpatory, without

regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *Id.*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327-28 (internal quotation marks and further citation omitted)). "Based on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup*, 513 U.S. at 329)). To warrant an evidentiary hearing, a petitioner must make "a threshold showing of actual innocence. The timing of the submission is relevant, as is the likely credibility of the affiants." *Sibley v. Culliver*, 377 F.3d 1196, 1206 (11th Cir. 2004) (citation omitted).

Truth be told, most of Lucas's "actual/factual innocence" claim amounts to a rehashing of other claims of error raised in his petition, coupled with an insistence that the jury's verdict based on the trial evidence was legally unsupported and incorrect as a factual matter. Specifically, Lucas again emphasizes that the State's case depended upon almost entirely on H.B.'s testimony, which he casts as allegedly weak, inconsistent, and uncorroborated. To that he adds complaints that his convictions violate double jeopardy, that the jury returned mutually exclusive guilty verdicts, and that the trial court erred by admitting evidence of collateral bad acts and improper testimony bolstering H.B.'s credibility. (Doc. 1-2 at 173).

These sorts of arguments, however, cannot establish actual innocence.  "An 'actual innocence' claim does not arise from mere technical or procedural errors committed during the course of trial or sentencing."  *Roark v. United States*, 2007 WL 4557772, at *3 (E.D. Ky. Dec. 21, 2007); *see also United States v. Miles*, 546 F. App'x 730, 733 (10th Cir. 2012) ("We must distinguish [legal error] simpliciter from a claim of actual innocence.").  Nor does such a claim properly invite this federal habeas court to second-guess the jury's credibility determinations and otherwise legally supported verdict of guilt against Lucas based on the evidence that was presented at trial.  Rather, actual innocence ordinarily requires the petitioner to present evidence that is both *new*, *i.e.*, *not* presented at trial, and so reliable and compelling that, considering all the evidence in the case, new and old, including that not necessarily admissible under court rules, it is more likely than not that no reasonable juror would find that the petitioner committed the offense.[11] *See Rozzelle*, 672 F.3d at 1011, 1017.

Nevertheless, in support of his claim of actual innocence, Lucas does cite two types of new evidence not presented at trial.  First, Lucas refers to an audio

_____

[11] The Supreme Court has allowed that a habeas petitioner may make out a gateway claim of actual innocence without any "new" evidence, but only in the unusual situation in which a postconviction change in the law establishes that the charged conduct underlying the conviction was not, in fact, criminal.  *See Bousley v. United States*, 523 U.S. 614, 616 (1998); *Johnson v. Florida DOC*, 513 F.3d 1328, 1334 n. 10 (11th Cir. 2008); *Wade v. Harris*, 2007 WL 1100451, at *4 n. 6 (N.D. Fla. Apr. 5, 2007).  Lucas makes no such claim.

recording of interview statements H.B. gave to personnel at the Children's Advocacy Center, at the request of the district attorney's office. Lucas argues that the recording "contained information that was possibly exculpatory and impeachment evidence that was vital to his defense" (Doc. 1-2 at 169), and he highlights that, on the morning of trial, the state trial court upheld the State's refusal to produce the recording. (*See* Doc. 8-3 at 52-54). However, Lucas has not produced a copy or a transcript of the audio recording. Accordingly, while he may believe that the recording may be exculpatory or impeaching, without being able to assess the actual content of the recording, even that broader proposition is speculative. The court certainly cannot determine that the recording might so seriously undermine H.B.'s credibility as to lend any material support to the likelihood that no reasonable juror would have credited her testimony and convicted Lucas.[12] *Cf. United States v. Jordan*, 316 F.3d 1215, 1252 n. 81 (11th

---

[12] Further, as far as the undersigned can tell, both the State and the county DHR produced all notes, records, and other documentary evidence in their possession related to all statements H.B. made to police and other investigators, including from the interview at the Children's Advocacy Center. That is, at the pretrial hearing, Lucas's counsel acknowledged that the State had produced H.B.'s prior statements "as written down by investigators and DHR workers," but he wanted the audio tape "just to hear the unvarnished version" of her statements. (Doc. 8-3 at 53). Thus, defense counsel was able to cross-examine H.B. about her prior statements and alleged inconsistencies between those and her trial testimony. Such included detailed questioning on how many prior statements H.B. had given (Doc. 8-4 at 151), whether she had discussed them with prosecutors before testifying (*id.* at 149-50), whether the man's penis she saw was circumcised or not (*id.* at 120-21), whether it was "erect" or "soft" (*id.* at 121, 145-46), exactly how she first reacted upon seeing it (*id.* at 143-44), and whether she had seen the man walk out

Cir. 2003) ("Mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality' [under *Brady*]. The defendant must show that there is a reasonable probability that the evidence could affect the outcome of the trial." (citations omitted)).

Second, Lucas seeks to show actual innocence based on what he calls "newly discovered scientific evidence" (Doc. 1-2 at 163), though in reality it is just three documents he printed off the internet. (*Id*. at 178-182). Lucas proffers them to prove that, when the incident occurred according to H.B.'s testimony, at a few minutes before 6:00 a.m. on December 31, 2013 (Doc. 8-4 at 102, 111), there would not have been light coming through the window of H.B.'s room as to allow her to have observed the things to which she testified at trial. The first piece of such purportedly exculpatory proof is a chart listing the time of day for twilight, sunrise, sunset, and other astronomical events for each date in December 2013 in Huntsville, Alabama. (Doc. 1-2 at 178-180). Lucas highlights that, on the morning of December 31st, morning twilight did not begin until 6:25 a.m., and sunrise was not until 6:53 a.m. (*Id*. at 180). Lucas argues, therefore, that, at the at the time of H.B.'s alleged assault, shortly before 6:00 a.m., no sunlight could have been visible through the window in H.B.'s room. Pointing to his second piece of

---

of her room or merely "heard" him do so (*id*. at 146-47). Despite such interrogation, the jury convicted Lucas, presumably crediting H.B.'s testimony.

"scientific" evidence, a chart of the phases of the moon for December 2013, Lucas makes a similar claim about an alleged lack of moonlight. Lucas emphasizes here that, on the evening of December 30th, at most only 6% of the moon might have been visible, at the end of a waning crescent phase. (*Id*. at 181). Finally, Lucas refers the court to a printout from Google maps, depicting an aerial photograph of what Lucas claims to be H.B.'s house where the incident occurred. (*Id*. at 182). On that document, Lucas has also drawn a small circle on the roof of the house, purportedly marking the location of H.B.'s bedroom window, as well as a number of circles around nearby objects outside, which Lucas identifies as "Trees taller than the house." (*Id*.) According to Lucas, this diagramed overhead photo demonstrates that "no light could have been able to shine through [H.B.'s] window from a street light." (Doc. 1-2 at 164).

Lucas's use of these documents to prove his actual innocence falls flat. To begin with, any probative value this evidence might have is substantially undercut by the fact, largely ignored by Lucas, that H.B. testified at trial that she was able to discern the events in her room in part because *a light was on in the hallway just outside her bedroom, some three or four steps from the doorway.* (R. 190-97; Doc. 8-4 at 122-29). In fact, Lucas's trial counsel cross-examined H.B. at length about the accuracy of her account considering the low level of light in her room,

including the lack of sunlight at the early hour, as well as the direction and angle of light coming from the hallway. (Doc. 8-4 at 122-29, 133-34, 147-48). Despite that, the jury still credited H.B.'s testimony, as it was lawfully entitled to do. And perhaps more to the point, Lucas's pedantic arguments regarding how much light would have been coming into H.B.'s room and from what angle or angles simply is not the stuff of actual innocence. That evidence could conceivable cast some doubt on H.B.'s credibility. But, Lucas's insistence to the contrary notwithstanding, in no way does the evidence conclusively demonstrate that H.B. was necessarily lying or mistaken about the essentials of her account, as to make it likely that no reasonable jury would credit her testimony. *See, e.g., Kuenzel v. Allen*, 880 F. Supp. 2d 1205, 1220 (N.D. Ala. 2011) (holding that affidavits from two witnesses opining that another witness could not have seen what she claimed given her location failed to establish actual innocence); *Parham v. Klem*, 496 F. App'x 181, 185 (3d Cir. 2012) ("A reasonable juror could credit Baccari's testimony that a streetlight provided enough light to enable Baccari to see his assailant and identify him in a photo."). Lucas's actual-innocence claim thus fails, whether raised as an independent ground for habeas relief or as a gateway to allow merits review of other, procedurally defaulted claims.

### D. Double Jeopardy (Petition Issue IV)

Lucas claims that the state trial court "was without jurisdiction and authority to convict and sentence [him] on both charges of attempted sodomy in the first degree and sexual abuse first degree … because by so doing it violated … Double Jeopardy." (Doc. 1-2 at 132). The Double Jeopardy Clause of the Fifth Amendment, applicable to state criminal proceedings through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 794 (1969), provides that no person shall "be subject to the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. It protects against, among other things, "multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)).

When a defendant claims his double-jeopardy rights have been violated by convictions of a single offense in more than one count of an indictment based on the same conduct, courts generally utilize the "same elements" test laid out by the Supreme Court in *Blockburger v. United States*, 284 U.S. 299 (1932). *See United States v. Dixon*, 509 U.S. 688, 696 (1993); *United States v. Gonzalez*, 834 F.3d 1206, 1219 (11th Cir. 2016); *Heard v. State*, 999 So. 2d 992, 1007 (Ala. 2007). Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact

which the other does not." 284 U.S. at 304. "Historically, courts have treated greater and lesser-included offenses as the same offense for double jeopardy purposes." *Currier v. Virginia*, ___ U.S. ___, ___, 138 S. Ct. 2144, 2150 (2018) (citing *Jeffers v. United States*, 432 U.S. 137, 150-51 (1977); *Brown*, 432 U.S. at 168-69). Ultimately, "the 'dispositive question' [in the *Blockburger* analysis is] whether [the legislature] intended to authorize separate punishments for the two crimes." *Albernaz v. United States*, 450 U.S. 333, 344 (1981) (quoting *Whalen v. United States*, 445 U.S. 684, 689 (1980)).

Specifically, Lucas's double-jeopardy argument targets his convictions at trial for attempted sodomy in the first degree, a Class B felony, and for sexual abuse in the first degree, a Class C felony, as being for the same offense because both are based on the same act, *i.e.*, that "Lucas was alleged to have rubbed his penis on the nose and upper lip of [H.B.]" (Doc. 1-2 at 132). And that latter offense is, he says, a lesser-included one of the former. From there, he contends that the "proper remedy" for such a double-jeopardy violation was to vacate his conviction on the lesser offense, sexual abuse. He further argues that it was "especially prejudicial" for the Alabama courts not to have followed that course in his case because the ACCA held on direct appeal that the evidence was insufficient to sustain his conviction on the greater offense, attempted sodomy. (*Id.*) In other

words, he maintains that the Alabama courts first had to throw out his sexual-abuse conviction on double jeopardy grounds *and* had to proceed to throw out his attempted sodomy conviction for evidentiary insufficiency. As such, Lucas posits he could have been sentenced to no more than six months imprisonment for attempted sexual misconduct, that being the lesser-included, Class B misdemeanor offense of attempted first-degree sodomy, upon which the jury had been instructed and the ACCA held was supported by the evidence. (Doc. 1-2 at 140).

At the outset, the State maintains that Lucas's double jeopardy claim is procedurally defaulted because he did not properly raise and exhaust it in the Alabama state courts. Lucas responds that he can avoid any procedural default because his failure to raise the claim in the state courts resulted from his counsel's ineffective assistance and because his double jeopardy argument allegedly goes to the state trial court's jurisdiction. It is unnecessary at this point, however, to untangle the parties' arguments related to the procedural default doctrine vis-à-vis Lucas's double jeopardy claim because that substantive claim is without merit.

Lucas is correct that both the federal courts and the Alabama courts recognize that when a defendant stands otherwise validly convicted on both a greater offense and a lesser-included offense based on the same conduct, the proper remedy for a double jeopardy violation is to vacate the conviction and sentence of

the lesser-included offense.  *See United States v. Boyd*, 131 F.3d 951, 954-55 (11th Cir.1997); *Williams v. State*, 104 So. 3d 254, 265 (Ala. Crim. App. 2012).  It is undisputed, however, that Lucas was not deemed *validly* convicted of the two offenses that he now insists are the same for double jeopardy purposes, namely, attempted first-degree sodomy and first-degree sexual abuse.  Rather, on direct appeal, the ACCA agreed with Lucas's argument that the evidence was insufficient to support his conviction for attempted first-degree forcible sodomy, so the court vacated that conviction.  Once that was done, any claim of double punishment based on that specific conviction became moot.  *See United States v. Bass*, 310 F.3d 321, 330 (5th Cir. 2002); *United States v. Brown*, 202 F.3d 691, 703 (4th Cir. 2000); *Jones v. Secretary,* 2015 WL 6869367, at *13 (M.D. Fla. Nov. 9, 2015); *Davis v. State*, 737 So. 2d 474, 479 (Ala. Crim. App. 1997), *rev'd in part on other grounds*, 737 So. 2d 480 (Ala. 1999).  Accordingly, Lucas is not entitled to habeas relief on his double-jeopardy argument, which also disposes of his associated claim (*see* Doc. 1-2 at 118-124), that his counsel was constitutionally ineffective for failing to raise this alleged double-jeopardy violation in the state courts.  *See Diaz v. Secretary for DOC*, 402 F.3d 1136, 1142 (11th Cir. 2006) (recognizing that a lawyer "is not ineffective for failure to raise a meritless argument.").

### D.      Mutually Exclusive Verdicts (Petition Issue V)

Lucas claims that the jury's verdict finding him guilty both of attempted

sodomy by "forcible compulsion" against H.B. and of subjecting H.B. to sexual

contact while she was "physically helpless" was contradictory because the

elements of the two offenses were "mutually exclusive" under the law and

evidence presented.  (Doc. 1-2 at 142).  Under Alabama law, "mutually exclusive

verdicts are the result of two positive findings of fact that cannot logically coexist.

In other words, it is legally impossible for the State to prove the elements of both

crimes." *Heard v. State*, 999 So. 2d 992, 1004 (Ala. 2007)).  Under state law, such

verdicts are not "permissible," *id.* at 1005, and the Alabama Supreme Court has

indicated that the proper remedy is generally to vacate both mutually exclusive

convictions and order a new trial.  *See id.* at 1004 (citing *Jackson v. State*, 577

S.E.2d 570, 575 (Ga. 2003)).  As far as federal law is concerned, the Supreme

Court appears to have left open whether the Constitution might allow guilty

verdicts on two counts with mutually exclusive elements, or, if it doesn't, what

remedies might be available to cure a violation.  *See Powell v. United States*, 469

U.S. 57, 69 n. 8 (1984).  However, some federal courts of appeals have indicated

that such verdicts are not just inconsistent but affirmatively irrational and may thus

be subject to review, presumably as a violation of due process.  *See Masoner v.*

*Thurman*, 996 F.3d 1003, 1005 (9th Cir. 1993); *Buehl v. Vaughn*, 166 F.3d 163,

178 (3d Cir. 1999); *United States v. Randolph*, 794 F.3d 602, 610-11 (6th Cir.

2015); *cf. United States v. Andrews*, 850 F.2d 1557, 1561 n. 12 (11th Cir. 1988)

(recognizing in dicta that footnote 8 of the Supreme Court's *Powell* opinion

potentially creates "exceptions" to the general rule that jury verdicts are not

reviewable on the ground that they are inconsistent).

 In support of his "mutually exclusive verdict" argument, Lucas observes that

Alabama law defines "forcible compulsion" as "physical force that overcomes

earnest resistance or a threat, express or implied, that places a person in fear of

immediate death or serious physical injury," Ala. Code § 13A-6-60(8).  By

contrast, he notes, state law defines a person as "physically helpless" if he or she is

"unconscious or for any other reason is physically unable to communicate

unwillingness to an act."  Id., § 13A-6-60(7).  Lucas therefore maintains that

because the jury convicted him of attempted forcible sodomy and of sexual abuse

based on evidence of a single alleged act of rubbing his penis on H.B.'s upper lip

area, it "is logically mutually impossible" for [H.B.] to have earnestly resisted

Lucas against his physical force when he alleged attempted to sodomize her, while

at the same exact time be unconscious.  (Doc. 1-2 at 146).  That is, Lucas insists

that the jury's verdict finding that he subjected H.B. to "forcible compulsion," as

required to convict on the attempted sodomy charge, negates a finding that she was "physically helpless," as required to convict on the sexual abuse charge, and vice versa, entitling him to have both convictions vacated and the case remanded for a new trial.

Lucas appears to rely primarily on state law in support of this claim, and he cites no provision of the federal Constitution as having been violated. Again, this court cannot grant habeas relief based on an error of state law unless it also implicates a federal law violation. Lucas has, however, cited two federal decisions in his brief in connection with this claim, so the court will assume he has sufficiently based it in part upon an alleged violation of the federal Constitution. (*See* Doc. 1-2 at 148-149 (citing *United States v. Daigle*, 149 F. Supp. 409 (D.D.C. 1957); *United States v. Powell*, *supra*).

But even if this claim is of federal dimension, Lucas has procedurally defaulted it by failing to properly raise it in the Alabama state courts. To be sure, he argued to the ACCA on his initial direct appeal that the jury's guilty verdicts on the attempted forcible sodomy and sexual abuse charges were mutually exclusive. But in so doing Lucas cited only state precedents and did not mention any provision of the United States Constitution nor any federal court precedents that might have fairly apprized the ACCA that the claim might rely on federal law,

even in part.  (*See* Doc. 8-8 at 64-67).  On top of that, the ACCA declined to address the state-law claim he did raise, holding that Lucas had waived it by failing to raise it in the trial court.  *Lucas*, 204 So. 3d at 938.  That refusal by the ACCA rests on an adequate and independent state ground, resulting in a procedural default of the claim under *Coleman v. Thompson*.  *See Layton v. Wise*, 2013 WL 5570060, at *7 (N.D. Ala. Oct. 9, 2013) (holding that petitioner defaulted habeas claim that jury's guilty verdicts on reckless murder and reckless endangerment counts were inconsistent; ACCA's refusal to address the claim on appeal rested on an independent and adequate state ground, namely, the petitioner's failure to raise the issue in the state trial court).

In response, Lucas effectively admits he has defaulted the claim, but he contends that the ACCA erred by failing to review it under a "plain error" standard or that this federal court might at least do so now.  (Doc. 1-2 at 147-48; Doc. 10 at 8-9).  Those arguments, however, are non-starters.  First, Lucas contends that plain error review was required or otherwise proper in the ACCA under Rule 45A, Ala. R. App. P.  But that is itself an argument based only on Alabama state law, and it is obviously wrong in any case because plain-error review under Rule 45A applies only to convictions for which the death penalty has been imposed.[13]  *Ex parte*

---

[13] Rule 45A, Ala. R. App. P. is captioned, "Scope of Review in Death Cases."  It provides in full as follows: "In all cases in which the death penalty has been imposed, the Court of Criminal

*Woodall*, 730 So. 2d 652, 665 (Ala. 1998); *Birdsong v. State*, 267 So. 3d 343, 348

n. 6 (Ala. Crim. App. 2017). No such convictions are involved in Lucas's case.

Lucas also seems to claim that either the ACCA or perhaps this court might

be required or authorized to conduct a plain-error review under Rule 52 of the

Federal Rules of Criminal Procedure, which provides: "A plain error that affects

substantial rights may be considered even though it was not brought to the court's

attention." However, the Federal Rules of Criminal Procedure apply only to

federal courts, not state courts. *See Scruggs v. Williams*, 903 F.2d 1430, 1434

(11th Cir. 1990). Accordingly, Rule 52(b) could not require the ACCA to conduct

a plain-error review of Lucas's claim on direct appeal in state court. *See Haney v.*

*Adams*, 641 F.3d 1168, 1171 n. 5 (9th Cir. 2011); *see also Biddie v. State*, 516 So.

2d 846, 846-47 (Ala. 1987) (rejecting the ACCA's suggestion Alabama appellate

courts had adopted a plain error review standard akin to Rule 52(b), Fed. R. Crim.

P., in non-death-penalty cases). It is likewise well established that Rule 52(b) does

not authorize federal courts, under the guise of plain error review, to consider the

merits of a state prisoner's claim for habeas relief that has been procedurally

---

Appeals shall notice any plain error or defect in the proceedings under review, whether or not
brought to the attention of the trial court, and take appropriate appellate action by reason thereof,
whenever such error has or probably has adversely affected the substantial right of the
appellant."

defaulted in state court. *See Engle v. Isaac*, 456 U.S. 107, 134-35 (1982). The plain-error rule cannot help Lucas.

Lucas also complains, however, that his "counsel failed to object to the mutually exclusive verdicts" and did not "raise the issue in a new trial." (Doc. 1-2 at 152). The ACCA expressly cited those omissions as the reason it would not address the issue on appeal. *Lucas*, 204 So. 3d at 938. Lucas thus argues that had his "defense counsel raised the issue of Lucas's mutually exclusive convictions and preserved it for appeal, there is a high probability that the Appellate Court would have reversed Lucas's convictions in this case." (*Id.*) Such *pro se* allegations, construed liberally, *see Dupree v. Warden*, 715 F.3d 1295, 1299 (11th Cir. 2013), in conjunction with the rest of Lucas's argument, raise a Sixth Amendment claim that Lucas's trial counsel rendered ineffective assistance under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984), by failing to preserve the "mutually exclusive verdict" issue for appellate review. (*See also* Doc. 1-2 at 122 (arguing that Lucas's counsel was constitutionally ineffective for failing to raise a double-jeopardy claim challenging his convictions for attempted sodomy in the first degree and sexual abuse in the first degree, based in part on factual findings that were "not only inconsistent but mutually exclusive"). A claim of ineffective assistance of counsel ("IAC") is established under *Strickland* by showing both that

61

(1) "counsel's performance was deficient," and (2) "that the deficient performance prejudiced the defense" because the "errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687.

Where counsel's failure to raise an underlying federal constitutional claim raises to the level of ineffective-assistance in violation Sixth Amendment violation, such may constitute cause excusing a procedural default of the underlying federal claim. *Murray v. Carrier*, 477 U.S 478, 488-89 (1986). Further, counsel may be deemed constitutionally ineffective, warranting federal habeas relief, for failing to raise or preserve a meritorious claim or issue founded only on state law. *See Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984), *superseded by statute on other grounds*, Insanity Defense Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 2057. However, whether raised as a substantive claim for habeas relief or as "cause" excusing a procedural default of an underlying constitutional claim, all claims alleging ineffective assistance of counsel ("IAC") claims are themselves subject to the procedural default doctrine. *See Edwards v. Carpenter*, 529 U.S. 446, 451-54 (2000).

A review of Lucas's state-court filings on his first direct appeal; his second direct appeal (following resentencing); and his petition for postconviction relief under Rule 32, Ala. R. Crim. P., discloses that Lucas never raised an ineffective-

assistance claim based on allegations that his trial counsel failed to preserve the "mutually exclusive verdict" claim for appeal. As a result, Lucas has procedurally defaulted that claim. However, resolution of the procedural default question is not that simple.

Although not cited by Lucas, the court is aware that, under the Supreme Court's decision in *Martinez v. Ryan*, 566 U.S. 1, 9 (2012), "inadequate assistance of counsel at initial-review [state] collateral proceedings may establish cause for a [state] prisoner's procedural default of a claim of ineffective assistance at trial." Thus, "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." Id. at 17. In *Martinez*, that rule was deemed to apply to Arizona state procedure, which expressly required that IAC claims must be raised for the first time in a state collateral review proceeding, thereby precluding such claims on direct appeal. *See id.* The next year, the Supreme Court extended *Martinez* to a Texas state procedure that on its face permitted IAC claims to be raised on direct appeal but, "as a matter of its structure, design, and operation – does not offer most defendants a meaningful opportunity to [do so]." *Trevino v. Thaler*, 569 U.S. 413, 428 (2013).

Alabama's procedure leans more towards that of Texas, insofar as claims alleging ineffective assistance of trial counsel may be brought on direct appeal in Alabama; indeed, they affirmatively must be so brought where it is "practicable" or they will be barred in a postconviction proceeding under Rule 32. Rule 32.2(d), Ala. R. Crim. P.; *see also* 32.2(a)(3), Ala. R. Crim. P. (providing generally that any non-jurisdictional claim is barred from review under Rule 32 where it "could have been but was not raised at trial"). Nevertheless, as in Texas, the bulk of IAC claims regarding trial counsel are deemed cognizable in Alabama postconviction proceedings, on the judicial understanding, express or implied, that most such claims cannot, as a practical matter, be presented any earlier. *See Alvarez v. Stewart*, 2016 WL 4870525, at *7-8 (N.D. Ala. Aug. 1, 2016) (Putnam, M.J.) ("The fact of the matter is that, in most instances of errors by pre-trial and trial counsel, the first practicable instance in which an ineffective-assistance-of-trial counsel claim in Alabama can be raised is outside of the direct review process, i.e., in the Rule 32 petition"), *report and recommendation adopted in relevant part*, 2016 WL 4762538 (N.D. Ala. Sept. 13, 2016), *certificate of appealability denied sub nom. Alvarez v. Warden*, 2017 WL 4250692 (11th Cir. Feb. 17, 2017). That is likely so principally because, to be heard on direct appeal, IAC claims must first have been raised in the trial court in a motion for a new trial, which must be filed

within a jurisdictional, 30-day deadline running from sentencing.  *See* Rule

24.1(b), Ala. R. Crim. P.; *Ex parte Ingram*, 675 So. 2d 863, 865 (Ala. 1996); *see*

*also V.R. v. State*, 852 So. 2d 194, 200-03 (Ala. Crim. App. 2002) (rejecting the

State's argument that Rule 32 was precluded from raising IAC claims based on the

possibility that his newly-appointed appellate attorney might have timely filed a

motion a new trial with bare-bones IAC allegations and then sought an extension

of time under Rule 24.4, Ala. R. Crim. P., to gather evidence and amend the

claims).  Further, Alabama courts recognize that an attorney cannot be reasonably

expected to challenge his own effectiveness in a motion for a new trial or on direct

appeal, *Elliott v. State*, 60 So. 3d 951, 954 (Ala. Crim. App. 2010), so in nearly all

cases in which the same attorney represents a defendant both at trial and on direct

appeal, IAC claims will wait until the Rule 32 case.  Alabama courts likewise

acknowledge that, even when a defendant is appointed new appellate counsel, he

or she cannot be expected to raise a claim alleging ineffective assistance of trial

counsel "if the trial transcript was not prepared in time … to have reviewed [it] to

ascertain whether such a claim was viable and to present the claim in a timely filed

motion for a new trial."  *V.R.*, 852 So. 2d at 202.  Thus, *Martinez* may apply to

Alabama prisoners who fail to present a claim of ineffective assistance of trial

counsel in a Rule 32 petition. *See Brown v. Thomas*, 2013 WL 5934648, at *2

(N.D. Ala. Nov. 5, 2013) (Proctor, J., adopting a report and recommendation).

But even assuming for the sake of argument that Lucas's procedural default

is excused under *Martinez* and *Trevino*, this IAC claim is due to be denied.

Specifically, Lucas cannot establish that his trial counsel's failure to raise and

preserve the "mutually exclusive verdict" issue for direct appeal rose to the level of

constitutionally deficient performance. The Eleventh Circuit has articulated the

high bar that Lucas must clear on that front, as follows:

> To show that an attorney failed to discharge his Sixth
> Amendment duty, a petitioner must establish that the attorney's
> conduct "amounted to incompetence under 'prevailing professional
> norms.' " [*Harrington v. Richter*, 562 U.S. 86, 105 (2011)] (quoting
> *Strickland*, 466 U.S. at 690) (emphasis added). "The [*Strickland*] test
> has nothing to do with what the best lawyers would have done. Nor is
> the test even what most good lawyers would have done." *White v.
> Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992). "[A] petitioner must
> establish that no competent counsel would have taken the action that
> his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315
> (11th Cir. 2000) (en banc) (emphasis added).

*Hittson v. GDCP Warden*, 759 F.3d 1210, 1248 (11th Cir. 2014).

Indeed, as the Supreme Court has further explained:

> Every trial presents a myriad of possible claims. Counsel might have
> overlooked or chosen to omit [a certain argument] while pursuing
> other avenues of defense. We have long recognized, however, that the
> Constitution guarantees criminal defendants only a fair trial and a
> competent attorney. It does not insure that defense counsel will
> recognize and raise every conceivable … claim.

*Engle*, 456 U.S. at 133-34.  Further, "the clarity or lack of clarity" of applicable law as it relates to the specific issue at hand "is important in determining whether" counsel's challenged act or omission "was reasonable."  *Smith v. Singletary*, 170 F.3d 1051, 1054 (11th Cir. 1999).  That is, while "[i]gnorance of well-defined legal principles is nearly inexcusable" for purposes of an ineffective assistance of counsel claim, "the rule that an attorney is not liable for an error of judgment on an unsettled proposition of law is universally recognized."  *Osley v. United States*, 751 F.3d 1214, 1228 (11th Cir. 2014) (*quoting Smith*, 170 F.3d at 154); *see also Black v. United States*, 373 F.3d 1140, 1144 (11th Cir. 2004); *Jones v. United States*, 224 F.3d 1251, 1258 (11th Cir. 2000) ("[W]e are not prepared to say categorically that counsel's failure to [preserve an argument] constituted prejudicial, ineffective nonfeasance while the law was still unsettled."); *Nelson v. Estelle*, 642 F.2d 903, 908 (5th Cir. Unit A Apr.1981) ("counsel is normally not expected to foresee future new developments in the law").

In light of the above principles, the failure of Lucas's trial counsel to object to the jury's verdict or move for a new trial on the ground that the guilty verdicts for attempted sodomy by "forcible compulsion" and sexual contact on a person who was "physically helpless" rested on "mutually exclusive" findings did not fall outside the broad range of reasonably competent attorney conduct.  It might be

assumed for the sake of argument that there is a reasonable likelihood Lucas might have prevailed on the claim on appeal, had it been properly preserved. We can also now conclude, with the benefit of hindsight permitted by the ACCA's opinion in Lucas's own case released in April 2016, that, under Alabama law, the evidence of his alleged offense conduct ultimately did not meet the definition of "forcible compulsion" required to convict on the attempted sodomy charge under § 13A-6-63(a)(1). But at the time of Lucas's trial in early 2015 (indeed, even today) the law of Alabama was (and is) unsettled in relation to whether and to what extent a victim that is "physically helpless" for purposes of § 13A-6-60(7) might also be subject to "forcible compulsion" within the meaning of § 13A-6-60(8). Thus, even when Lucas's counsel raised the issue on direct appeal, the only two cases relied upon in the brief were *Heard, supra*, and *Burton v. State*, 979 So. 2d 845 (Ala. Crim. App. 2007), both of which were cited merely for general propositions about mutually exclusive verdicts. (Doc. 8-8 at 64-67). Both are murder cases, neither of which involves a sex offense or an issue of forcible compulsion, physical helplessness, or capacity to consent. Even now, Lucas points to no case concerning mutually exclusive verdicts in the context of sex crimes or the statutory definitions at issue here, never mind specifically holding that a victim's being asleep or otherwise "physically helpless" might affirmatively negate an inference

68

of having also been subjected to "forcible compulsion." *Cf. Cole v. United States*, 2019 WL 3767499, at *8 (N.D. Ala. Aug. 9, 2019) (holding that attempted first degree rape of a physically-helpless or mentally-incapacitated individual under Ala. Code § 13A-6-61(a)(2) has as an element the use, attempted use, or threatened use of physical force sufficient to categorically qualify as a "violent felony" for purposes of the Armed Career Criminal Act); *Parrish v. State*, 494 So. 2d 705, 709 (Ala. Crim. App. 1985) (holding that the fact that a 12–year–old girl makes no effort to resist a sexual confrontation beyond pretending to be asleep does not negate the inference that sufficient legal force was used to satisfy the element of forcible compulsion); *H.L.B. v. State*, 28 So. 3d 24, 25–26 (Ala. Crim. App. 2009) (Welch, J., dissenting) (arguing that the majority's unpublished memorandum affirmance of conviction for forcible rape under § 13A-6-61(a)(1) was in error because the victim was asleep when attacked). Indeed, in one ancient case, the Alabama Supreme Court recognized that the use of force may be implied in the act of sexually assaulting a sleeping victim:

> It is true that the element of force need not be actual, but may be constructive or implied. If the woman is mentally unconscious from drink, or asleep, or from other cause is in a state of stupefaction, so that the act of the unlawful carnal knowledge on the part of the man was committed without her conscious and voluntary permission, the idea of force is necessarily involved in the wrongful act itself,–the fact of penetration.

*McQuirk v. State*, 4 So. 775, 775–76 (Ala. 1888).  Finally, as the State contended

on appeal, the evidence, viewed in the light most favorable to the prosecution, also

might have allowed a finding that Lucas continued to touch H.B.'s face with his

penis for a few moments as she began to wake up, whereupon she pulled away.  It

was also thus perhaps at least reasonably arguable that, at that instant, H.B. could

have been deemed to be able to resist at least a minimal level of "force" inherent in

Lucas's act of touching her.

Based on the foregoing, it would not have been reasonably apparent to all

minimally competent attorneys that the jury's verdict convicting Lucas of both

attempted forcible sodomy and sexual contact with a physically helpless victim

may have been mutually exclusive under Alabama state law.  Therefore, the failure

of Lucas's counsel to raise such a claim at trial did not rise to the level of

constitutionally deficient performance under *Strickland*.  This claim is due to be

denied.

### E.    Ineffective Assistance of Counsel (Petition Issue III)

Lastly, Lucas raises a host of claims alleging that his attorneys provided

constitutionally ineffective assistance.  The Sixth Amendment guarantees criminal

defendants a right to "reasonably effective" legal assistance.  *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984).  A claim of ineffective assistance of

counsel ("IAC") is established under *Strickland* by showing both that (1)

"counsel's performance was deficient," and (2) "that the deficient performance

prejudiced the defense" because the "errors were so serious as to deprive the

defendant of a fair trial, a trial whose result is reliable." 466 U.S. at 687. A habeas

petitioner carries the burden to establish both elements. *Lawhorn v. Allen*, 519

F.3d 1272, 1293 (11th Cir. 2008) (citing *Atkins v. Singletary*, 965 F.2d 952, 958-59

(11th Cir. 1992)).

> With regard to the first prong, the Eleventh Circuit has explained:
> To establish a constitutionally deficient performance, the defendant
> must "identify the acts or omissions ... that are alleged not to have
> been the result of reasonable professional judgment" to "show that
> counsel's representation fell below an objective standard of
> reasonableness" and "outside the wide range of professionally
> competent assistance." *Strickland*, 466 U.S. at 687, 690. The "highly
> deferential" reviewing court must "indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable
> professional assistance," *id.* at 689, and recognize that cases
> warranting the grant of habeas relief based on an ineffective assistance
> claim "are few and far between." *Chandler v. United States*, 218 F.3d
> 1305, 1313 (11th Cir. 2000) (en banc) (quotation and citation
> omitted). ... "[T]he defendant must overcome the presumption that,
> under the circumstances, the challenged action 'might be considered
> sound trial strategy.'" *Strickland*, 466 U.S. at 689. ... Because "it is
> all too easy to conclude that a particular act or omission of counsel
> was unreasonable in the harsh light of hindsight," *Bell v. Cone*, 535
> U.S. 685, 702 (2002), we must make "every effort ... to eliminate the
> distorting effects of hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time." *Strickland*, 466 U.S. at 689.

*Lawhorn*, 519 F.3d at 1293-94.

Once constitutionally deficient performance is established, the petitioner must also prove prejudice. To do so the petitioner must convince the court "that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. While a petitioner need not show that counsel's deficient conduct "more likely than not altered the outcome of the case," it is not enough for the petitioner to show that counsel's errors merely had "some conceivable effect on the outcome of the proceeding." *Id.*, 466 U.S. at 693. Once a court determines that counsel's performance was not constitutionally deficient, it is unnecessary to address whether prejudice resulted. *Walker v. Jones*, 10 F.3d 1569, 1573 (11th Cir. 1994). Likewise, a court may decline to address the performance prong if convinced that the prejudice prong cannot be satisfied in any event. *Boyd v. Allen*, 592 F.3d 1274, 1293 (11th Cir. 2010).

In "Issue III" of his habeas petition, Lucas raises the following "Grounds" in support of claims that his counsel rendered ineffective assistance:

> (Grounds 1 and 7): his attorneys failed to properly argue at trial and on direct appeal that the State was required to disclose prior recorded statements of the victim under *Brady v. Maryland*, 313 U.S. 83 (1963), and its progeny (Doc. 1-2 at 41-46, 99-103);

(Grounds 2, 3, and 4): trial counsel failed to properly object to and otherwise argue against the admission of evidence and jury instructions related to collateral bad acts (*id*. at 47-81);

(Ground 5): trial counsel failed to argue that Alabama's statutes defining and prohibiting sexual abuse in the first degree, Ala. Code §§ 13A-6-66 and 13A-6-60(3), are unconstitutionally vague (*id*. at 82-92);

(Grounds 6 & 8) trial counsel failed to properly and timely object to and otherwise argue against the admission of testimony from H.B.'s mother and Investigator Chad Smith that effectively "bolstered" the credibility of H.B.'s testimony (*id*. at 93-98, 104-108);

(Ground 9): trial counsel failed to properly and timely object to and otherwise argue against the testimony of Investigator Chad Smith that allegedly created the false impression that Lucas was "taking flight" or otherwise avoiding prosecution or being interviewed by law enforcement (Doc. 1-2 at 109-112);

(Grounds 10 and 12): trial counsel failed to argue that, under Ala. Code § 13A-4-2(c), the evidence either established as a matter of law that Lucas had renunciated and abandoned any attempt to commit forcible sodomy, there entitling him to a judgment of acquittal on that charge, or that the evidence at least created a jury question on the issue, entitling him to a jury instruction on it (*id*. at 113-117, 125-128);

(Ground 11): trial counsel failed to argue that Lucas's convictions violated double jeopardy, in violation of the Fifth Amendment and Alabama law (*id*. at 118-124); and

(Ground 13): trial counsel failed to request a jury instruction on the definition of the term "mentally incapacitated" as it related to the elements of the charged offense of sexual abuse in the first degree (*id*. at 129-131).

These claims are addressed in turn below.

### 1. Counsel's Alleged Failure to Demand Disclosure of Victim Statements under *Brady* (Grounds 1 and 7)

Lucas first complains that his attorneys failed to properly argue that the State was required to disclose prior statements of the victim under *Brady* and its progeny. Under *Brady*, the State violates a defendant's right to due process if it withholds evidence that is favorable to the defense and material to the defendant's guilt or punishment. *Smith v. Cain*, 565 U.S. 73, 75 (2012) (citing *Brady*, 373 U.S. at 87). To establish a *Brady* violation, the defendant must show: (1) the government possessed evidence that was favorable to him; (2) he did not possess the evidence and could not have obtained it with reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) if the evidence had been disclosed, there is a reasonable probability that the outcome of his trial would have been different. *United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002). Evidence is "favorable" under *Brady* if it is exculpatory or impeaching. *See United States v. Naranjo*, 634 F.3d 1198, 1212 (11th Cir. 2011). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Hano*, 922 F.3d 1272, 1292 (11th Cir. 2019) (internal quotations omitted). The standard for "materiality" under *Brady* tracks the standard for "prejudice" under *Strickland*. *See Jennings v. McDonough*, 490 F.3d 1230, 1243 (11th Cir. 2007).

The State argues that Lucas has procedurally defaulted this claim. However, it is unnecessary to address that issue because the claim fails on its merits. At the outset, the undersigned recognizes that Lucas's trial counsel filed multiple motions for discovery that expressly cite *Brady* and assert that the State was required to produce evidence that was exculpatory or impeaching, including prior recorded statements of the victim. (Doc. 8-1 at 39-49, 58-59, 60-61, 62-63, 64-65; Doc. 8-2 at 18-19, 22-23). Thus, to extent that Lucas contends that his trial counsel's performance was deficient based on an alleged failure to argue for discovery of H.B.'s statements based specifically on *Brady* and its progeny, that claim is factually unsupported.

Further, while Lucas at times seems to allude generally to prior "statements" of H.B. that the State did not produce, the only such specific statement that Lucas identifies and that the State appears to have, in fact, withheld was an audio recording of the interview that H.B. gave to personnel at the Children's Advocacy Center. Lucas's trial counsel expressly sought discovery of that recording citing *Brady* (Doc. 8-2 at 22-23), and he argued at the pre-trial motion hearing that production was warranted because the evidence was potentially exculpatory or impeaching. (*See* Doc. 8-3 at 52-54). Ultimately, the trial court denied Lucas' demand for the tape, but that obviously does not render trial counsel's performance

deficient in the asking, even assuming for the sake of argument that the trial court's ruling was erroneous.

Lucas also complains that his trial counsel's performance was deficient in that he failed to "object" after the trial court denied his motion asking the court to require that the State produce the tape recording of the H.B. interview. Lucas posits that such failure was deficient performance on the theory that it operated to waive the issue for potential appellate review. However, on the morning of trial, the state court held a hearing on the merits of that discovery motion, unambiguously denied it, and acknowledged that Lucas's counsel had "made his record" on the issue. (Doc. 8-3 at 54). As such, the trial court's adverse ruling on the motion was itself sufficient to preserve the issue for appellate review; counsel was not required thereafter to further "object." *See Richardson v. State*, 819 So. 2d 91, 94 n. 1 (Ala. Crim. App. 2001); *Newton v. State*, 673 So. 2d 799, 800 (Ala. Crim. App. 1995). Therefore, counsel's performance was not deficient on that basis, either.

Lucas also cannot demonstrate prejudice on this claim. Particularly, Lucas has not provided this court with a copy of the recording or a transcript thereof. Accordingly, while he may believe that the recording may be exculpatory or impeaching, even that proposition is speculative without knowing the actual

content of the recording.  The court certainly cannot determine that the recording would materially undermine confidence in the outcome of Lucas's trial.  *See Jordan*, 316 F.3d at 1252 n. 81 ("Mere speculation or allegations that the prosecution possesses exculpatory information will not suffice to prove 'materiality' [under *Brady*].  The defendant must show that there is a reasonable probability that the evidence could affect the outcome of the trial." (citations omitted)).  Indeed, as far as record reveals, both the State and the county DHR produced all notes, records, and other documentary evidence in their possession related to all statements H.B. made to police and other investigators, including from the interview at the Children's Advocacy Center.  At the pretrial hearing, Lucas's counsel acknowledged that the State had produced H.B.'s prior statements "as written down by investigators and DHR workers," but he wanted the audio tape "just to hear the unvarnished version" of her statements.  (Doc. 8-3 at 53).  Thus, defense counsel was able to cross-examine H.B. about her prior statements and alleged inconsistencies between those and her trial testimony.  This claim is due to be denied.

### 2. Counsel's Alleged Failure to Properly Argue Against Admission of Evidence and Jury Instructions Related to Collateral Bad Acts against M.C. (Grounds 2, 3 & 4)

Lucas next faults his counsel for allegedly failing to make proper arguments in an effort to seek exclusion of evidence of Lucas's collateral bad acts that he maintains was inadmissible under Rule 404(b), Ala. R. Evid. The State argues that this claim is also procedurally defaulted. But, again, it is unnecessary to resolve that issue because this IAC claim also fails on the merits.

As a threshold matter, much of this claim is simply an extended argument that the state trial court committed error by allowing the prosecution to present evidence of acts related to Lucas's alleged offenses against M.C. and instructing the jury that it might consider such evidence to show motive in connection his charged offenses against H.B. However, Lucas's specific claim in that regard is that the admission of that evidence and the giving a limiting instruction on it was in violation of state law, including Rule 404(b) of the Alabama Rules of Evidence. Because that does not allege a violation of federal law, it is not cognizable in habeas. *See Estelle v. McGuire*, 502 U.S. 62 (1991).

Insofar as Lucas contends that his counsel's performance was deficient under *Strickland* in failing to make arguments seeking exclusion of the bad-acts evidence involving Lucas and M.C., the claim is frivolous. The record shows that

78

Lucas's trial counsel moved for separate trials on the alleged offenses against the different victims to keep the evidence related to one victim from being heard at the trial of the offenses against the other victim. (Doc. 8-1 at 52-54). Indeed, the state trial court granted that motion. (*Id.* at 72). Despite that, a few weeks before trial, the State filed a notice of intent to assert evidence of other acts under Rule 404(b), Ala. R. Evid., including evidence that Lucas allegedly sexually assaulted M.C. (Doc. 8-2 at 11-12). Lucas's counsel filed a lengthy written response in opposition, ably arguing that the evidence identified by the State's notice was inadmissible under Rule 404(b). (*Id.* at 13-17). The State thereafter filed a reply (*id.* at 33-36), as well as a supplemental notice of intent. (*Id.* at 37-38). That prompted Lucas's trial counsel to file two more briefs in opposition and a motion in limine, asserting that the admission of the evidence would violate Rules 404(b) and 403, Ala. R. Evid. (*Id.* at 39-40, 47-51). Trial counsel then argued at the pre-trial motion hearing that the collateral bad acts evidence is inadmissible, incorporating the grounds in his written filings. (Doc. 8-3 at 66-71). Then, after the trial court rejected those arguments and admitted the evidence, Lucas's appellate counsel argued that the trial court's allowing the evidence had violated Rule 404(b). (Doc. 8-8 at 62-75). The ACCA rejected that claim on the merits, holding that the trial court had acted within the bounds of its discretion. *Lucas*,

204 So. 3d at 939-41. As a result, Lucas has failed to show either that his counsel's performance was deficient or that he suffered prejudice. This claim is due to be denied.

### 3. Failure to Argue that Alabama's statutes prohibiting sexual abuse in the first degree are unconstitutionally vague (Ground 5)

Lucas next contends that his trial counsel was ineffective for failing to argue that the Alabama statutes defining the conduct prohibited as sexual abuse in the first degree are unconstitutionally vague. Alabama Code § 13A-6-66(a)(2), the relevant subsection under which Lucas was convicted provides: "A person commits the crime of sexual abuse in the first degree if … he subjects another person to sexual contact who is incapable of consent by reason of being physically helpless or mentally incapacitated." Lucas's instant claim specifically concerns the phrase "sexual contact," which is further defined by Ala. Code § 13A-6-60(3) as "any touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party." Lucas maintains that the statutory definitions of "sexual contact" and "the sexual or other intimate parts of a person" are so vague and indefinite that men of common intelligence must necessarily guess at its meaning, and that his trial counsel was ineffective for failing to so argue. The State argues that this IAC claim has been

procedurally defaulted. But, again, the undersigned concludes that it may be simply denied on the merits.

"It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits...." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (quoting *Giaccio v. Pennsylvania*, 382 U.S. 399, 402-03 (1966)). However, "the Constitution does not require perfect clarity in the language of statutes …." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) Rather, the "void-for-vagueness doctrine requires that a penal statute 'define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Marte*, 356 F.3d 1336, 1342 (11th Cir. 2004) (citation omitted). Moreover, "a party 'to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional.'" *United States v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010) (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960)).

In essence, Lucas would metaphorically throw up his hands and claim that a person of common intelligence could not glean that his alleged conduct, rubbing

his naked penis on the upper lip of a female victim asleep in her bed, qualified as "touching of the sexual or other intimate parts of a person," and thus as "sexual contact," for purposes of §§ 13A-6-66(a)(2). (*See* Doc. 1-2 at 86 ("What constitutes sexual contact? Such a plain term requires a man like Lucas, at the peril of his liberty and life, to speculate at the meaning of the term.")). The undersigned disagrees. While Lucas argues this claim over the span of 11 typed pages, he conspicuously fails to cite any authority involving a case, in Alabama or elsewhere, in which a court held that this or a like sex-offense statute was declared unconstitutionally vague. To the contrary, the Eleventh Circuit, the Alabama Court of Criminal Appeals, and this court have rejected claims similar those Lucas now insists his trial attorney was constitutionally-bound to raise. *See Daniels v. State*, 418 So. 2d 185, 186 (Ala. Crim. App. 1982) (holding that the term of "sexual contact," as defined in § 13A-6-60(3) is not unconstitutionally vague); *Harris v. Warden Dewayne Estes*, 2016 WL 4123660, at *6 (N.D. Ala. Aug. 3, 2016) (rejecting claim that Ala. Code § 13A-6-69.1(a), prohibiting a person over 16 years old from subjecting another person less than 12 years old to "sexual contact"), *certificate of appealabiliy denied sub nom. Harris v. Warden, Att'y Gen. State of Ala.*, 2017 WL 4198314 (11th Cir. June 13, 2017); *United States v. Panfil*, 338 F.3d 1299, 1301 (11th Cir. 2003) (denying vagueness challenge to 18 U.S.C. §

2422(b), prohibiting a person from using interstate commerce to "knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ] any individual who has not attained the age of 18 years, to engage in … any sexual activity for which any person can be charged with a criminal offense"); *United States v. Rojas*, 145 F. App'x 647, 648–49 (11th Cir. 2005) (same); *see also United States v. Geraci*, 74 F. App'x 241, 243 (4th Cir. 2003) (rejecting that 18 U.S.C. § 2244(a)(1) is unconstitutionally vague and overbroad on the theory that its "definition of 'sexual contact' is virtually limitless"). Lucas cannot show deficient performance or prejudice under *Strickland*, so this claim is due to be denied.

### 4. Failure to Object to Testimony of Other Witnesses Bolstering H.B.'s Credibility (Grounds 6 & 8)

Lucas contends that his counsel was also ineffective in failing to object to opinion testimony from H.B.'s mother and from Investigator Chad Smith that Lucas says improperly "bolstered" H.B.'s testimony by vouching for her credibility and went to the ultimate issue of Lucas's guilt. In support of this claim, Lucas relies principally upon *Sanders v. State*, 986 So. 2d 1230 (Ala. Crim. App. 2007), wherein the defendant challenged testimony from the his ex-wife, the minor victim's mother, whereby the ex-wife stated she believed the victim's allegations of sexual abuse by the defendant. Specifically, the ACCA held that allowing the victim's mother to give an opinion as to the victim's credibility could have invaded

the province of the jury.  *Id.* at 1234-35; *see also Snowden v. Singletary*, 135 F.3d 732, 737-38 (11th Cir. 1998).  The State argues that this claim is procedurally defaulted.  But even if it's not, Lucas fails to establish deficient performance or prejudice under *Strickland*, for the reasons explained below.

Lucas first complains about the testimony from H.B.'s mother, S.B. regarding what transpired when H.B. came to her on the morning of the incident:

Q. (By [the Prosecutor]) Did [H.B.] tell you what happened?

A. Yes.

Q. Okay. Once she told you what happened, what did you do next?

A. I questioned her on the surety of her statements, that if this was true she needed to be one hundred percent sure it was true, that it's a very strong allegation. And she was absolutely adamant that it was true.  She did not dream it, she did not imagine it.

[Defense Counsel]: Object to what --

A. That it was true.

[Defense Counsel]: Object.

THE COURT: Sustained.  Sustained.

Q. (By [the Prosecutor]) All right. Let --

[Defense Counsel]: Ask for a limiting instruction, Your Honor.

THE COURT: Of what kind, Mr. Jensen?

[Defense Counsel]: That the jury is not to consider that statement.

84

THE COURT: Ladies and Gentlemen, I've sustained the objection in so far as anything that [H.B.] may have said to her mom, so please disregard anything that she may have said to her mom.

[Defense Counsel]: Thank you.

* * *

Q. (By [the Prosecutor]) What did you do once she told you that?

A. Sure. I questioned her as to the confidence in her statement.

Q. And then once she expressed to you that answer, what did you do?

A. My oldest daughter Ashley had arrived at this time and we -- the three of us discussed it.

Q. Okay. After that discussion, what happened next?

A. I elected to call the local police department.

(R. 239-241, Doc. 8-5 at 20-22).

Lucas argues that, by her testimony above, S.B. was permitted improperly to vouch for and bolster H.B.'s credibility, and that his counsel failed to object or move to strike it on that basis. A review of S.B.'s testimony reveals, however, that she did not, in fact, give her personal opinion on either H.B.'s credibility, *e.g.*, "I believe H.B. is telling the truth," "H.B. would never lie about something like this," etc. or the issue of Lucas's guilt, *e.g.*, "I think he did it." Rather, S.B. testified factually that she questioned H.B. about her accusation and impressed upon H.B.

that she had to be certain about it owing to the seriousness of the charge.  S.B. then

recounted, again, factually, that H.B. answered by confirming her allegation

against Lucas.  Lucas's counsel lodged an objection to that response.  The trial

court sustained and instructed the jury not to consider the statements H.B. made to

S.B., presumably because S.B.'s answer might be construed as hearsay relating a

prior consistent statement by H.B.  *See Frazier v. State*, 258 So. 3d 369, 378 (Ala.

Crim. App. 2017).  In any event, the objection by Lucas's counsel prompting the

trial court to issue an instruction to disregard what H.B. allegedly said to S.B. was

reasonable and sufficient under the circumstances.

Finally, S.B. also stated that, after hearing H.B.'s accusation and further

conferring with H.B. and her sister, S.B. decided to contact the police.  One could

presumably infer from that response that S.B. believed H.B. to be telling the truth.

However, it would have been entirely reasonable trial strategy for Lucas's counsel

to let that matter lie.  For starters, it was highly doubtful that S.B.'s particular

testimony about deciding to go to the police was inadmissible.  But even if it was,

any further objection or motion to strike could risk reinforcing the undesirable

inference that S.B. believed her daughter's accusation.  In any event, that was

likely already a relatively obvious if unstated proposition given that S.B. was

testifying as a cooperative, prosecution witness.  As such, Lucas also can't show

that his counsel's alleged omissions in responding to S.B.'s testimony resulted in any material prejudice, never mind the level required to prevail under *Strickland*.

Lucas also raises a similar complaint that his trial attorney allowed Inspector Smith to vouch for H.B.'s credibility. While S.B. did not express a personal opinion about H.B.'s credibility, as explained above, it is fair to say that Inspector Smith did, albeit very briefly. To wit, the testimony Lucas here cites is as follows:

> Q. Okay. And so when the forensic interviewer is interviewing the victim, in this case interviewing [H.B.], where were you at?
>
> A. I was in the other room right beside it, which there's a monitor, a TV monitor, and I'm watching it.
>
> Q. So you're watching real time?
>
> A. Yes, sir.
>
> Q. Okay. After you watched her interview what was the next step in the investigation?
>
> * * *
>
> A. *We conferred and decided that she was credible* and my next step was to interview the offender if I could.

(R. 289-90, Doc. 8-5 at 70-71 (emphasis added)).

It might be assumed for argument's sake that Smith's answer, that, after watching H.B.'s initial forensic interview, he and other, unspecified personnel involved in the case "conferred and decided that she was credible," was improper

under Alabama law because it was offered as an opinion bolstering H.B.'s credibility. Nevertheless, the remark was essentially made in passing and in the broader context of explaining why the police continued thereafter to investigate and arrest Lucas. As such, it was not unreasonable as a matter of trial strategy for Lucas's counsel not to respond to it. Even if the remark was inadmissible, if Lucas's counsel were to stop the proceedings to attack it, that could run the risk of drawing attention to the very fact the police and others involved in the investigation had found H.B.'s story to be credible. Equally to the point, it's fanciful to think that consideration of Smith's isolated remark, in light of all the evidence at trial, materially undermines confidence in the trial result, as required to establish *Strickland* prejudice. This claim is due to be denied.

### 5. Failure to Object to Investigator Smith's Testimony Allegedly Creating False Impression that Lucas was Intending to Flee or Avoid Being Interviewed (Ground 9)

Lucas claims that his trial counsel was constitutionally ineffective because he failed to object to the admission of testimony by Investigator Chad Smith that Lucas characterizes as having "created the false impression to the jury that Lucas was avoiding prosecution, taking flight, and the only way [Smith] was able to 'interview' Lucas was to have an arrest warranted issued." (Doc. 1-2 at 110). The

State argues that that this IAC is procedurally defaulted. However, even assuming to the contrary, the claim is plainly without merit.

The testimony by Smith about which Lucas here complains is as follows:

Q. Okay. After you watched [H.B.'s] interview what was the next step in the investigation?

* * *

A. We conferred and decided that she was credible and my next step was to interview the offender if I could.

Q. (By Mr. Gann) Okay. Tell me about that process in this particular case, how did you -- did you try to make contact with Mr. Lucas?

A. Yes, sir.

Q. Did you? Tell me about that.

A. I talked to him on January the 2nd by phone and he agreed to come in and talk to me, he said, on January the 17th.

Q. Okay. Did he come talk to you on the 17th?

A. He did not show up.

Q. Did you have any other phone contact or any other verbal contact with him after the 17th?

A. I can't remember if I talked to him or not.

Q. Let me ask you this, a better question maybe. After he didn't show up on the 17th, what did you do next?

A. I can't remember if I called him or not, but I also talked with you guys and we ended up obtaining a warrant.

Q. Okay. You got a warrant for his arrest?
A. (Witness nods head up and down.)

THE COURT: Is that a yes?

THE WITNESS: Yes, I'm sorry.

Q. (By Mr. Gann) What happened once you issued the warrant, or once the warrant was issued?

A. He was arrested on the 26th of January. And on the 27th I went to the jail and was able to speak with him.

(R. 289-291, Doc. 8-5 at 70-72).

Lucas first insists that Smith's remark that he would look to interview Lucas "if [he] could" implied that Smith "had concerns, doubts about being able to interview Lucas as if Lucas might flee before he could interview him," thereby "impl[ying that] Lucas was guilty." (Doc. 1-2 at 109). Lucas seems to claim that Smith's remark was somehow inadmissible because, he says, flight "'is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.'" (*Id.* (*quoting Ex parte James*, 797 So. 2d 413, 417 (Ala. 2000), *quoting, in turn, Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Lucas also suggests that Smith's subsequent testimony about not being able to interview Lucas until obtaining an arrest warrant was misleading because, Lucas says, "there were numerous phone contacts" between them about scheduling Lucas's interview and Smith failed to

acknowledge in his testimony that Lucas did not appear for his scheduled interview because he was ill and that Lucas later had to go out of town for a medical emergency. (Doc. 1-2 at 110).

Lucas's argument, however, is nonsense. Neither Smith's remark that he would look "to interview [Lucas] if [he] could" nor anything else in Smith's testimony could be reasonably understood as accusing Lucas of "flight." Nor did the trial court instruct the jury on that issue. Thus, Lucas's "flight" argument is set against a strawman fancied from his imagination. Rather, Smith's comment, made in passing, that he was looking to interview Lucas "if [he] could" merely suggested, rather vaguely at that, an uncertainty that he would be able to do so, if perhaps for no other reason than that criminal suspects may refuse to give statements to law enforcement. Indeed, Smith thereafter clearly acknowledged that Lucas did later give a statement. Lucas has offered no grounds or authority to support that his trial counsel could have successfully objected to Smith's testimony recounting initial difficulties in trying to interview Lucas as improper evidence or that the failure to object resulted in prejudice under *Strickland*. Further, any failure by Lucas's counsel to draw further attention to delays in Lucas's submitting to an interview could be reasonably viewed as a strategic decision. This claim is due to be denied for failure to meet either prong of *Strickland*.

### 6. Failure to Argue that Lucas had Renounced and Abandoned Any Attempt to Commit Forcible Sodomy (Grounds 10 and 12)

Lucas next contends that his trial counsel was ineffective for failing to move for a judgment of acquittal or ask for a jury instruction based on the theory that Lucas had renounced and abandoned any attempt to commit forcible sodomy for purposes of Ala. Code § 13A-4-2(c).  Under Alabama law, "a person is guilty of an attempt to commit a crime if, with intent to commit a specific offense, he does any act towards the commission of such offense."  Ala. Code § 13A-4-2(a).  However, under Ala. Code § 13A-4-2(c), a person is not liable under § 13A-4-2

> if, under circumstances manifesting a voluntary and complete renunciation of this criminal intent, he avoided the commission of the offense by abandoning his criminal effort and, if mere abandonment is insufficient to accomplish such avoidance, by taking further and affirmative steps which prevented the commission thereof.  The burden of injecting this issue is on the defendant, but this does not shift the burden of proof.

In this vein, Lucas appears to claim that, even assuming the evidence supported that he rubbed his penis on H.B.'s upper lip as she slept, the evidence also showed, he says, that he "never attempted to use physical force upon her, never threatened her in any manner, never tried to insert his penis into her mouth, and without being compelled to leave her room, simply turned and calmly walked away."  (Doc. 1-2 at 114).  As a result, Lucas maintains, "if … [his] intent was to

sodomize [H.B.] by force, [he] obviously then abandoned such intention by stepping back and walking away." (*Id*. at 115). He further says that if his trial attorney had raised this renunciation and abandonment theory in a motion for an acquittal on the attempted forcible sodomy charge, he would have likely prevailed. Indeed, he suggests, albeit without any explanation or citation to authority, that he also could or would not have been convicted of and resentenced on the lesser, misdemeanor offense of attempted sexual misconduct, as direct by the ACCA on appeal. (*See id*. at 117). Alternatively, Lucas insists that, even if the evidence did not establish his renunciation and abandonment as a matter of law, it at least supported a jury instruction on the issue, which, he says, gives rise to a reasonable probability that, but for counsel's errors, the jury might have acquitted him of one or both charges. (*Id*. at 127-128).

The State contends this claim is procedurally defaulted, but even assuming it is not, the claim is meritless. To start with, because the ACCA vacated Lucas's conviction for attempted forcible sodomy based on evidentiary insufficiency, he could not have suffered prejudice based on counsel's failure to raise any kind of additional arguments in support of a judgment of acquittal or an additional jury instruction in relation to that specific charge. To the extent that the jury found Lucas guilty of first-degree sexual abuse, that is a fully consummated, completed

93

offense, not an inchoate, "attempt" crime under § 13A-4-2(a). Thus, a renunciation defense under § 13A-4-2(c) could have no application to that conviction. *Cf. Wheeler v. State*, 570 So. 2d 876, 876 (Ala. Crim. App. 1990 (recognizing that, under § 13A-4-2(c), "abandonment is a defense *to an attempt*" (emphasis added)). As explained in the Committee Comments to Ala. Code § 13A-4-1(b), "While remorse after a crime, whatever its effect on sentence, does not generally affect criminality, there is a good argument that the rule should be otherwise when dealing with inchoate crimes like attempt and solicitation, where the evil against which the crime is directed is the injury which is anticipated but which has not yet occurred."

Finally, the evidence adduced at trial also plainly would not have entitled Lucas to even a jury instruction on his renunciation and abandonment defense, never mind a judgment of acquittal, on any charged crime. "If a man resolves on a criminal enterprise and proceeds so far in it that his act amounts to an indictable attempt, it does not cease to be such even though he voluntarily abandons the evil purpose." *Chaney v. State*, 417 So. 2d 625, 627 (Ala. Crim. App. 1982) (quoting 54 A.L.R.3d at 633); *see also id.* ("The fact that the defendant did not shoot Mrs. Chaney a second time does not provide any evidence of abandonment for the overt act in furtherance of the criminal intent had already occurred."). "Although

94

complete and voluntary abandonment is a defense to the crime of attempt, § 13A–4–2(c), 'A renunciation is not voluntary and complete if motivated by a belief that circumstances exist which increase the probability of detection or apprehension of the defendant....' Commentary to § 13A–4–1." *Lee v. State*, 540 So. 2d 802, 804 (Ala. Crim. App. 1988); *see also Towns v. State*, 449 So. 2d 1273, 1277 (Ala. Crim. App. 1984) (holding that the defendant's "unsuccessful attempt to pull the suit out of the bag after she saw the security guard walking toward her does not constitute an abandonment under § 13A–4–2(c)"). A criminal defendant is not entitled to a jury instruction on a defense where there is no evidence reasonably supporting the theory. *See Carter v. State*, 843 So. 2d 804, 806-07 (Ala. 2001). Here, the evidence related to Lucas's purported renunciation was that he was rubbing his penis by H.B.'s mouth on her upper lip as she slept and that he ceased and withdrew only once H.B. woke up and saw him, pants down, penis in hand next to her face. To suggest that such circumstances might constitute a complete and voluntary renunciation borders on the absurd. This IAC claim fails for both want of deficient performance and lack of prejudice under *Strickland*.

**7.      Failure to Argue that the Convictions for Attempted
          Forcible Sodomy in the First Degree and for Sexual Abuse
          in the First Degree Violate Double Jeopardy (Ground 11)**

Lucas contends that his trial counsel was ineffective based on a failure to raise a claim that his convictions for attempted forcible sodomy in the first degree and for sexual abuse in the first degree violated double jeopardy.  The undersigned has previously addressed the double jeopardy issue as a substantive claim for habeas relief.  As explained there, that underlying claim is without merit because the ACCA agreed with Lucas's claim on appeal that his attempted forcible sodomy conviction was not supported by sufficient evidence and vacated that conviction. Once that occurred, any issue of double punishment based on the attempted forcible sodomy conviction became moot.  As a result, Lucas's associated claim asserting that his trial counsel was ineffective for failing to raise that double jeopardy argument likewise fails for lack of prejudice.

**8.      Failure to Request a Jury Instruction on the Term
          "Mentally Incapacitated," in relation to Elements of Sexual
          Abuse in the First Degree (Ground 13)**

In his final ground for habeas relief based on his trial counsel's alleged ineffective assistance, Lucas complains that his counsel failed to ask the trial court to instruct the jury on the term "mentally incapacitated," as it related to the

elements of sexual abuse in the first degree. The State argues that this claim is procedurally defaulted. But, again, on the merits, the claim is frivolous regardless.

The relevant portion of the statute under which Lucas was charged provides that a "person commits the crime of sexual abuse in the first degree if ... he subjects another person to sexual contact who is incapable of consent by reason of being *physically helpless or mentally incapacitated*." Ala. Code § 13A-6-66(a)(2) (emphasis added). The trial court instructed the jury on the applicable statutory definition of "physically helpless," as meaning "that a person is unconscious or for any other reason is physically unable to communicate unwillingness to an act." Ala. Code § 13A-6-60(7); (*see* Doc. 8-7 at 4-5). However, as Lucas points out, the trial court did not similarly instruct the jury on the statutory definition of "mentally incapacitated," which means "that a person is rendered temporarily incapable of appraising or controlling his conduct owing to the influence of a narcotic or intoxicating substance administered to him without his consent, or to any other incapacitating act committed upon him without his consent." *Id.*, § 13A-6-60(6).

Nevertheless, Lucas's counsel plainly was not deficient in not asking for an instruction defining the term "mentally incapacitated." Indeed, asking for such an instruction would have itself been improper and could have done nothing but *hurt* Lucas's case. That is so because although § 13A-6-66(a)(2) allows a conviction

97

based on proof that the victim was *either* "physically helpless" *or* "mentally incapacitated," the trial court's jury charge advised the jury that the State might prevail on the sexual abuse count only if it proved as an element that H.B. was "physically helpless." (*See* Doc. 8-7 at 4 ("Physically helpless is another one of the elements that the State must prove.").) That was legally the correct course because the State's evidence supported that H.B. was asleep and therefore "unconscious or for [some] other [was] physically unable to communicate unwillingness to an act," but no proof was presented that H.B. was given some intoxicating substance without her consent or suffered some other incapacitating act without her consent. In other words, what Lucas is now effectively arguing is that his counsel should have asked the court to give the jury the option of convicting him of sexual abuse in the first degree based upon an additional, alternative theory that not only was not supported by the evidence but also was not pursued by the State. This IAC claim obviously fails under both *Strickland* prongs.

## V. CONCLUSION

Based on the foregoing, the court finds that the petition for a writ of habeas corpus is due to be denied and this action dismissed with prejudice. An appropriate order will be entered.

**DONE** AND **ORDERED** ON SEPTEMBER 19, 2019.

_____

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

160704